In re BROWN et al.

(Circuit Court of Appeals, Second Circuit. January 8, 1912.)

No. 127.

**1. TRUSTS (§ 358*)—FOLLOWING TRUST FUNDS—IDENTIFICATION.**

In order to follow an alleged trust fund, there must be some identification by the alleged cestui que trust of the property sought to be charged.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 523, 553; Dec. Dig. § 358.*

Following trust property converted by trustee as dependent on its identification, see note to In re McIntyre & Co., 10 C. C. A. 545.]

**2. BANKRUPTCY (§ 188*)—LIENS ON ESTATE—CREATION.**

The mere fact that the misuse of a trust fund by a bankrupt has gone to swell, in one form or another, the general assets, is insufficient to charge a lien on such assets, unless the claimant is able to prove that the property converted, either in its original shape or substituted form, came into the hands of the bankrupt's trustee.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 270, 286–295; Dec. Dig. § 188.*]

**3. BANKRUPTCY (§ 188*)—LIENS ON ESTATE—EVIDENCE.**

Evidence *held* insufficient to show that the proceeds of certain securities, converted by the bankrupts to their own use, ever came into the hands of the bankrupts' trustee so as to entitle claimants to a lien on the bankrupts' general assets to the amount of the securities so wrongfully converted.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 270, 286–295; Dec. Dig. § 188.*]

Appeal from the District Court of the United States for the Southern District of New York.

In the matter of bankruptcy proceedings of Albert O. Brown and others. Petition by the First National Bank of Princeton, Ill., and others, to revise an order of the District Court of the Southern District of New York, dismissing claims in reclamation of the several petitioners, alleging a prior claim to the same fund. Affirmed.

See, also, 183 Fed. 861; 189 Fed. 432.

Thorndike Saunders, for appellants.

Hays, Hershfield & Wolf (Ralph Wolf, of counsel), for appellee.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

LACOMBE, Circuit Judge. A claim of the Princeton Bank originating in the transactions here recited was considered by this court in Re Brown, 175 Fed. 769, 99 C. C. A. 345.

On August 13, 1908, the bankrupts, A. O. Brown & Co., stock-brokers, received from the Princeton Bank $1,787.50 for the purchase —being the full purchase price—of twenty (20) shares Atchison, To-peka & Santa Fé Railroad Company. These shares were forthwith purchased by the brokers, but were shortly thereafter converted to their own use. On August 18th, the brokers received from the bank $1,403.13, the full purchase price of 25 shares of Missouri Pacific, which was also bought and subsequently converted by the brokers. Bankruptcy ensued on August 25, 1908, about noon, and upon learning of the conversion the bank undertook to rescind the whole transaction and to follow the purchase price as a trust fund. This we held it could not do, for reasons stated; but we also held that it might follow the proceeds of the converted stock as a trust fund, if it could do so by satisfactory proof. The first of these proceedings is concerned with the bank's attempt to trace these proceeds. It is sufficient now to say that the other four claims are of a similar character, for stocks the property of the several claimants which were converted by Brown & Co. before bankruptcy. They are for $945, $1,392.50, $6,675, and $12,270.89, respectively; total, $21,783.39. Still another claimant, Schuyler & Co., whose stock was obtained from it by the bankrupts on August 24th, and by them converted, is undertaking to trace its proceeds ($9,600) into the same fund. A petition to revise an order made in its proceeding was argued at the last session of this court, and decision therein is handed down herewith. In re A. O. Brown & Co., 193 Fed. 30. From other petitions to revise we have learned that there were numerous other persons having similar claims.

Ten shares of the claimant's Atchison stock was sold to one broker for $857.50, and ten shares to another broker for $900; both transactions taking place August 13th. Checks for these sums were on the same day deposited in the Hanover National Bank. Of the 25 shares Missouri Pacific, 20 shares were sold to one broker on August 17th, and the proceeds, $1,120, deposited in the National Bank of Commerce. The other 5 shares were sold to another broker on August 24th, and the proceeds, $280, deposited on the same day in the Hanover Bank.

The special master finds that there remained continuously from August 17th to August 24th, in the Bank of Commerce, a balance largely in excess of $1,120. The balance on the morning of August 25th, plus a small deposit then made, amounted to $21,079.97. This was exhausted by the payment of checks subsequently presented, leaving a debit balance against the bankrupts so that no money was received by the trustee from the Bank of Commerce account. If the $1,120 of claimant's money was left in that bank, it has been dissipated and can be traced no further. Among those checks was one to the order of the Hanover Bank, which was deposited in that bank on the 25th, in the amount of $4,000. It is the theory of the claimant that instead of the proceeds of the 20 shares Missouri Pacific remaining in the Bank of Commerce where they were indisputably deposited, until they were dissipated by the extinction of the credits, they were transferred by the bankrupts from the Bank of Commerce to the Hanover, as part of this $4,000. This seems a very tenuous presumption in the absence of any evidence to support it. The amounts are differ-

ent, there is nothing to show that there was a sum of $2,880 trust money of some sort, which with claimant's $1,120 was being shifted by the bankrupts for some unexplained reason from one bank to another.

[1] As we said in Re McIntyre, Grace's Appeal, 185 Fed. 96, 108 C. C. A. 543:

"While the doctrine of following trust funds has been much extended in the modern decisions, there has never been a departure in the federal courts from the principle that there must be some identification of the property sought to be charged with the trust funds."

We have here a firm of brokers in failing circumstances, who have converted and sold the stocks of very many of their customers. It seems a violent presumption to assume that throughout their subsequent transactions with their banks they are continually manipulating their funds so as to keep the moneys they have misappropriated segregated and intact. So far as concerns the fund which came to the trustee as unexpended balance ($2,055.97) of the bankrupts in their account with the Hanover Bank, the $1,120 of this claimant's money has not been identified as constituting any part of it.

The deposits of proceeds of claimant's stock in the Hanover Bank were, as we have seen, $1,757.50 on August 13th and $280 on August 24th; total $2,037.50. The special master finds that

"The opening and closing balances in the Hanover Bank on and after August 13th were largely in excess of these (two) deposits."

But the finding is not sufficient; there is no reason why it should be assumed that these balances were being reserved because they represented the trust money of the Princton Bank, rather than because they represented trust money of Simpson, or Scrotton, or any of the others similarly situated enumerated above (aggregating $21,783.39) —or, indeed, any of the other claimants who from time to time have appeared in this proceeding seeking to trace and recover for property converted by the bankrupts.

Moreover, it is not enough to show that there were morning and afternoon balances for several successive days large enough to cover the amount of money which was improperly converted. It might very well be that on any one day checks were presented which exhausted the morning balance and its accretions, in which event these moneys would have been dissipated. We are not prepared to assent to the proposition that subsequent deposits are to be taken as having been made to make good claimant's money thus drawn and spent. Board of Commissioners v. Strawn, 157 Fed. 51, 84 C. C. A. 553, 15 L. R. A. (N. S.) 1100. Our own conclusion would be that the $1,757.50 of the proceeds of claimant's stock, which went into the Hanover Bank on August 13th, has not been shown to be any part of the balance which was turned over by that bank to the trustee on September 5th. Nevertheless the master and the District Judge seem to have reached the conclusion that it remained in the account on August 24th. Since both of them had the same understanding of the law as that above expressed, viz., that the first check drawn on any given day might sweep away the balance carried over, and that it would be the merest specu-

lation to assume that subsequent deposits restored the original situation, it is possible that they had some evidence, which is not in this record, as to the continuous condition of the daily balances prior to December 24th. Moreover, there is the deposit of claimant's proceeds to the extent of $280 on the 24th, which makes it necessary to consider the transactions of that day and the next.

The special master finds that the morning balance on Monday, August 24th, was $130,867.12, which with credits during the day of $3,-743,526.60 made an aggregate of $3,874,393.36. Of these credits the following were loans on collateral: $200,000; $85,000, afterwards paid off and replaced by a $50,000 loan; and $80,000. Against these there were charged, on the 24th, drafts of $3,686,213.19, leaving a balance at the close of business on Monday and the opening of business on Tuesday of $6,180.17. This is a sum considerably below the aggregate of the claims of the five parties to this proceeding ($23,-820.39), to say nothing of the other claim referred to supra ($9,600). Surely there can be no presumption, in the absence of testimony, and in the face of these other claims, that $1,757.50 of this balance was claimant's money. The subsequent history of this balance, however, renders it unnecessary to discuss the question whether some proportionate amount of claimant's money was included therein.

The books of the bank show the following credits on the 25th:

| | |
|---|---:|
| Loan | $ 8,000 00 |
| Deposit | 23,000 00 |
| " | 4,000 00 |
| " | 45,000 00 |
| " | 4,860 00 |
| " | 2,000 00 |
| " | 5,000 50 |
| " | 5,000 00 |
| " | 3,332 53 |
| " | 66,600 00 |
| " | 17,300 00 |
| " | 62 07 |
| " | 165 00 |
| " | 1,367 47 |

Of course the balance ($6,180.17) carried over from the 24th was also a credit available on the morning of the 25th. The books show the following debits on the 25th:

| | |
|---|---:|
| | $146,600 00 |
| | 705 00 |
| Check on Mech. Bk., payment stopped | 500 00 |
| Applied in reduction of loan | 3,562 24 |

The testimony shows that the first entry, $146,600, represented the certification of a check. Claimant's counsel calls attention to this circumstance and contends that certification is not payment, citing authorities in support of that proposition. There is no question, however, about the payment. The check was paid by the bank in due course. We are clearly of the opinion that when the question is as to the disposition of a fund in a bank account, the time when certification is signed and noted by the bank is the significant time; it is then that the credit items which make up the balance of account are segre-

gated by the bank as against the obligation assumed by certification. So long as such certification is outstanding, the bank would not allow any of the money thus appropriated to be drawn out.

So far as the books of the bank record the transactions, they fully support the finding of the District Judge that "the very first check drawn was greater than the opening balance"; indeed, it was greater than that balance, increased by the $8,000 loan and by all the deposits prior to the one of $17,300. The last item of the proceeds sought to be traced would thus be dissipated. The officers of the bank, however, testified that the order in which the entries of debit and credit were made in the books was not necessarily the order in which the separate transactions actually took place. Much testimony was taken in the effort to establish the real sequence of events. It may be thus summarized. The bank had made several loans to bankrupts on collateral which in each case was worth more than the face of the loan; arrangements had also been made on the 24th, for a further loan, similarly secured, of $25,000 to $30,000 to be made on the 25th, if required, and the collateral was left with the bank; but before the entries were actually made, placing the loan to the credit of the firm on that day the assignment took place. Since the bank account was not overdrawn at the close of that day, this collateral was turned over to the receiver. The vice president of the bank testified to a further loan made on August 25th, of $250,000 against 1,000 United States Steel Common and 3,000 Amalgamated Copper. When asked if it appeared on a statement drawn off from the bank books and showing the checking account, he replied: "It should. We probably gave them a check for that $250,000." Of course, if that loan was in the shape of a cashier's check, it would not appear among the credits of the 25th, unless the bankrupts deposited it, which they apparently did not. The various collateral notes contained the usual clause subjecting any overplus of collateral to a lien for any balances due the bank. With regard to the certification of the large check, it appears that on the 24th bankrupts gave a check for $146,600 to A. H. Combs & Co. for balance due on the purchase of some stock. Certification was refused on the 24th by the Hanover Bank because of insufficient funds and likewise was refused on the morning of the 25th, for the same reason. Thereupon Combs & Co. drew their own check to the order of Brown & Co. for $66,600 which was indorsed and deposited to the latter's credit, whereupon the bank at once certified that $146,600 check. As to the precise time when this transaction took place, the vice president who made the certification says that his recollection of the time is somewhat uncertain. H. B. Combs testifies that he deposited the certified check with the Bank of Commerce probably at 20 minutes to 12.

Upon the proof we concur with the District Court that whatever proceeds of claimant's stock were deposited in the Hanover Bank were dissipated by the certification of the check for $146,600 on the morning of August 25th, and can be no further traced.

As we have seen, the Hanover Bank had in its possession various surpluses of collaterals above the amount of the several notes for

which such collateral was pledged, some of these collaterals were paid for by checks drawn on the Hanover Bank and paid on the 24th, and it is contended that a lien for the trust funds is established against the surpluses of collaterals so purchased. But there is nothing to trace claimant's money into any particular stocks or bonds, or into the collateral put up against any particular loan.

[2] It was said in Smith v. Mottley, 150 Fed. 268, 80 C. C. A. 154, that:

"In the absence of proof to the contrary, the reception of the funds being so near to the assignment by the bank, it may be presumed that the assets which came to the hands of the trustee were augmented by the proceeds of the check"—which check in that case was the thing converted.

Thus baldly stated the quotation might seem to support the theory that the beneficiary would have a lien on property which came to the trustee because the bankrupts, had they not misused the trust fund, would have had to borrow that additional sum from their banks on the collateral they had with them covering their various notes, and therefore the banks would have paid themselves out of such collateral, and the trustee in bankruptcy would not have obtained so much from them. The same court which decided Smith v. Mottley, however, subsequently held, in Board of Commissioners v. Strawn, 157 Fed. 49, 84 C. C. A. 553, 15 L. R. A. (N. S.) 1100, that the mere fact that the misuse of a trust fund has gone to swell, in one form or another, the general assets of a bankrupt, is not enough to charge a lien on such assets; and that, to impress a trust upon the property of a tort-feasor who has used the trust fund in his private affairs, it must be traced in its original shape or substituted form. We fully concur in this statement of the law. No doubt the individual whose property has been converted has a high equity and is entitled to certain well-settled presumptions; but we cannot assent to the proposition that he may trace his money into any specific fund or security merely by inferences based on presumptions without substantive testimony to sustain them. The burden of proof is on the claimant at the outset; it rests upon him at the close of the case. If he has not, then, upon the whole proof, made clear the final resting place of his converted property or its substitute, he cannot sustain his claim.

[3] In our opinion the Princeton Bank has not established a lien against the general assets nor against any particular asset, which came to the hands of the trustee in bankruptcy, and his claim was properly dismissed.

It is not necessary to discuss the other four claims, which are not treated in detail in the brief. The facts are similar to those above recited, and the conclusion is the same as to all.

The decree is affirmed.