BRENNAN v. TILLINGHAST.

TILLINGHAST v. BRENNAN.

(Circuit Court of Appeals, Sixth Circuit. January 7, 1913.)

Nos. 2,253, 2,254.

1. BANKS AND BANKING (§ 80*)—INSOLVENCY—CLAIMS—TRUST FUNDS—CONVERSION OF SECURITIES.

A bank of which complainant was a customer while insolvent wrongfully sold certain of complainant's stock deposited with it as collateral, receiving $3,558.75, which it deposited in another bank to its credit in a pre-existing open account May 1, 1909. From May 1st to 8th, inclusive, the bank drew drafts on this account in favor of an express company for amounts aggregating $2,807.32, receiving from the express company over its counter the amount of the drafts in cash, and at all times from May 1st to 10th, inclusive, the open account, after crediting all deposits and deducting drafts, showed a balance in favor of the insolvent bank always in excess of the proceeds of the stock so sold. On May 11th the account was overdrawn, however, but at all times from February 1st until the bank closed there was more than $3,500 of cash on hand in the bank's vaults, and $15,652.23 in cash came into the hands of a receiver. Held, that the proceeds of the stock constituted a trust fund which did not lose its character when mingled with the other moneys of the bank, and, when the deposit was drawn down by the express company drafts, the trust attached to the amount paid by the express company for the drafts pro tanto, and hence there was a sufficient following of the fund to entitle complainant to a preferred claim therefor.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 184–196; Dec. Dig. § 80.*]

2. TRUSTS (§ 352*)—TRUST FUNDS—LOSS OF TRUST CHARACTER—MINGLING WITH OTHER FUNDS.

Where the proceeds of stocks wrongfully sold by an insolvent bank constituted a trust fund for the benefit of the owner, they did not lose their trust character by being mingled with other moneys of the bank, provided the owner could trace the money either in its original shape or in substituted form into assets which came into the hands of the bank's receiver.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 520–525; Dec. Dig. § 352.*]

3. TRUSTS (§ 358*)—TRUST FUNDS—MINGLING WITH OTHER MONEYS.

Proof that a tort-feasor has mingled trust funds with his own and made payments thereafter out of the common fund, in the absence of anything else appearing, is a sufficient identification of the remainder of that fund coming into the hands of the receiver not exceeding the smallest amount the fund contained subsequent to the commingling as trust property, under the presumption that the trust moneys had not been paid out.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 523, 553; Dec. Dig. § 358.*]

4. TRUSTS (§ 372*)—TRUST FUNDS—BLENDING WITH OTHER FUNDS—PRESUMPTIONS.

Where trust funds are blended with other moneys in a bank account from which there had been drawings from time to time, the presumption that the sums first drawn out were from the moneys which the tort-feasor had a right to expend in his own business, and that the balance which remained included the trust fund, will not stand against evidence to the contrary.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 600–603; Dec. Dig. § 372.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**5. TRUSTS (§ 372*)—TRUST FUNDS—MINGLING—TRANSFERS.**

The presumption that a tort-feasor, having mingled trust funds with his own, paid out his own funds, and that the remaining balance included those of the trust, has no application where the evidence shows that the first moneys drawn from the mingled fund by the tort-feasor were not in fact dissipated by him, but merely transferred in a substituted form to another fund retained in his own possession.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 600–603; Dec. Dig. § 372.*]

**6. BANKS AND BANKING (§ 75*)—DEPOSITS—RECLAMATION—INSOLVENCY.**

Where a bank, being hopelessly insolvent, receives a deposit with knowledge that it cannot pay its debts and must fail in business, the depositor may rescind for fraud and reclaim the deposit or its proceeds, if traced into the assets of the bank coming into the hands of the receiver.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 157; Dec. Dig. § 75.*

Deposits in bank after insolvency, see note to Richardson v. New Orleans Coffee Co., 43 C. C. A. 588.]

**7. BANKS AND BANKING (§ 75*)—INSOLVENCY—DEPOSITS—RECEIPT.**

Where the officers of a bank at the time they received a deposit from complainant had known for 10 years that the bank was insolvent, but it did not appear but that the officers had reason to believe that by a continuing business the bank might retrieve its fortunes, and that it would be necessary to close, the receipt of the deposit did not constitute such fraud as would entitle the depositor to rescind and recover the deposit from the bank's receiver for fraud.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 157; Dec. Dig. § 75.*]

**8. BANKS AND BANKING (§ 75*)—RECEIPT OF DEPOSITS—FRAUD.**

Complainant, being indebted to a bank which was insolvent for money borrowed, deposited $1,000 with the bank, with the understanding that it would be used in payment of defendant's note at maturity. *Held*, that such deposit was taken by the bank as quasi security for the payment of its debt, and hence a receipt of the deposit, notwithstanding the bank's insolvency, was not fraudulent.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 157; Dec. Dig. § 75.*]

**9. APPEAL AND ERROR (§ 719*)—ASSIGNMENTS OF ERROR—SCOPE—REVIEW.**

Where, in a proceeding to recover certain claims against the receiver of an insolvent bank, complainant's $1,000 note in favor of the bank was allowed as an offset against his preferred claim arising out of the bank's wrongful sale of his collateral consistently with the prayer of the bill, and complainant assigned no error on appeal because the offset was not allowed against his claim as a general creditor under a certificate of deposit, error, if any, in that regard, will not be reviewed.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2968–2982, 3490; Dec. Dig. § 719.*]

Appeals from the Circuit Court of the United States for the Northern Division of the Western District of Michigan; Arthur C. Denison, Judge.

Bill by John Brennan against Philip Tillinghast, as receiver of the First National Bank of Ironwood, Mich. From a decree awarding complainant a part of the relief demanded, both parties appeal. Affirmed.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Charles M. Humphrey, of Ironwood, Mich., for John Brennan.

I. A. Fish and Quarles, Spence & Quarles, all of Milwaukee, Wis., for the receiver.

Before WARRINGTON and KNAPPEN, Circuit Judges, and SANFORD, District Judge.

SANFORD, District Judge. John Brennan, the complainant below, filed a bill in the Circuit Court, sitting in equity, against the First National Bank of Ironwood, Mich., an insolvent banking association, and Philip Tillinghast, receiver of said bank, the defendants below, seeking to recover as preferred claims against the bank the value of certain stock deposited by Brennan with the bank as collateral and sold by the bank, and the sum of $1,000 deposited by Brennan with the bank a short time before it was placed in the hands of the receiver. The court, on final hearing, allowed the first of these items as a preferred claim, and disallowed the second. Brennan and the receiver have each appealed from this decree; and the two appeals have been heard together.

The material facts are these:

The First National Bank of Ironwood, Mich., hereinafter called the Ironwood Bank, was organized as a national banking association in 1888, and conducted a banking business in Ironwood until June 21, 1909, when it closed its doors, and Tillinghast was appointed as its receiver by the Comptroller of the Currency.

On February 1, 1909, Brennan borrowed from the Ironwood Bank the sum of $1,000, for which he executed his promissory note, due in four months, with interest, and deposited with the bank as collateral security certificates for certain shares of mining stock, including 200 shares of the capital stock of the Shattuck-Arizona Copper Company.

On April 8th Brennan deposited with the Ironwood Bank the sum of $1,000, for which he received a certificate of deposit. This deposit was received by the cashier of the bank, with the understanding at the time that it was to be used in paying Brennan's note at its maturity.

The receiver admitted in his answer that the bank was insolvent from February 1st, when the note was given, to June 21st, when the receiver was appointed, including the date, April 8th, on which the deposit was received; and the cashier who received the deposit testified that he had known for about ten years before that the bank was insolvent.

On May 1st the Ironwood Bank, through its cashier, without the knowledge or consent of Brennan, sold 195 of the shares of the stock of the Shattuck-Arizona Copper Company which it held as collateral to his note, the proceeds of which, $3,558.75, were on that day deposited in the City National Bank of Duluth, Minn., hereinafter called the Duluth Bank, to the credit of the Ironwood Bank, in a pre-existing open account.

Against this open account in the Duluth Bank, in which other deposits were made from time to time, the Ironwood Bank drew from day to day various drafts to meet its daily clearing house balances.

And from May 1st to May 8th, inclusive, the Ironwood Bank also drew four drafts on the Duluth Bank against this open account, in favor of the American Express Company, for amounts aggregating $2,807.32. These drafts were purchased by the express company from the Ironwood Bank on the dates on which they were drawn, and the express company on such dates paid the Ironwood Bank the amounts of such drafts, in cash, over its counter. At all times from May 1st to May 10th, inclusive, the open account of the Ironwood Bank at the Duluth Bank, after crediting all deposits made and deducting all drafts drawn, showed a balance in favor of the Ironwood Bank, varying in amount from day to day, but always in excess of $3,558.75. On May 10th this balance amounted to $4,273.39. On May 11th, however, this account of the Ironwood Bank at the Duluth Bank was overdrawn in the sum of $1,068.75.

On June 14th, after Brennan's note had fallen due and when he did not know that any part of his stock had been sold by the Ironwood Bank, he, after a conversation with its cashier, who advised him to let the note run, gave up his original intention of paying his note with his certificate of deposit, and, instead, paid the Ironwood Bank the interest due on his note, and gave the bank a renewal note for the principal.

In addition to these transactions, Brennan also had a checking account with the Ironwood Bank, and, when its doors closed, owed it for an overdraft on this account the sum of $216.07.

The books of the Ironwood Bank furthermore show that at all times from February 1st until it closed on June 21st there was $8,000 or more of cash on hand in its vaults, and $15,652.23 in cash came into the hands of the receiver. And, while it appears that the bank books contained many false cash entries, the evidence fully sustains the finding of the court below that from and after April 8th until the closing of the bank it had continually on hand in cash in its own vaults more than $3,500.

The remainder of the stock held by the bank as collateral on Brennan's note has been returned by the receiver to Brennan.

The evidence further showed that claims had been filed against the Ironwood Bank aggregating $603,000; that the Comptroller of the Currency had levied an assessment of 100 per cent. on its stockholders; that 30 per cent. dividends had already been paid to creditors; that not exceeding 10 per cent. more could be paid; and that the other claims for preferences which had been filed and which were still pending aggregated between $3,500 and $4,000.

On this state of facts we have reached the following conclusions:

[1] 1. The court below correctly held that Brennan was entitled to recover as a preferential claim, to be paid in full, the sum of $3,558.75 received by the Ironwood Bank from the sale of his stock, less the amount of his note, $1,000, and of the overdraft, $216.07, leaving a balance of $2,342.68, for which sum he was granted a decree against the receiver.

[2] It is undisputed that the proceeds of the sale of Brennan's stock, wrongfully converted by the Ironwood Bank to its own use, consti-

tuted a trust fund, which did not lose this character when mingled with other moneys of the bank, and that Brennan was entitled to recover the amount thereof as a preferred claim, if, and to the extent that, he sustained the burden of proof of tracing this money, either in its original shape or in a substituted form, into the moneys which came into the hands of the receiver as part of the assets of the bank. Peters v. Bain, 133 U. S. 670, 693, 10 Sup. Ct. 354, 33 L. Ed. 696; Board of Commissioners v. Strawn (C. C. A. 6) 157 Fed. 49, 54, 84 C. C. A. 553, 15 L. R. A. (N. S.) 1100; In re Brown (C. C. A. 2) 193 Fed. 24, 29, 113 C. C. A. 343, affirmed sub nom. First National Bank of Princeton v. Littlefield, 226 U. S. 110, 33 Sup. Ct. 78, 57 L. Ed. ——; Empire State Surety Co. v. Carroll County (C. C. A. 8) 194 Fed. 593, 604, 114 C. C. A. 435, and cases cited.

[3] And proof that the tort-feasor has mingled the trust funds with his own and made payments thereafter out of the common fund, is, nothing else appearing, a sufficient identification of the remainder of that fund coming into the hands of the receiver, not exceeding the smallest amount the fund contained subsequent to the commingling, as trust property, under the legal presumption that he regarded the law and neither paid out the trust fund nor invested it in other property, but kept it sacred. Board of Commissioners v. Strawn, supra, at page 51; Empire State Surety Co. v. Carroll County, supra, at page 605, and cases cited.

Applying these general principles, we are of opinion that the court below correctly held that the proceeds of the sale of Brennan's stock constituted a trust fund held by the Ironwood Bank for his benefit; that the transactions in connection with the four cash drafts drawn in favor of the express company constituted, in effect, a transfer of $2,807.32 of this trust fund in cash to the vaults of the Ironwood Bank; that this portion of the trust fund must be deemed to have remained in the vaults of the Ironwood Bank as part of the trust fund, in cash, until it came into the possession of the receiver; and that as the amount thus remaining in the trust fund was more than sufficient to cover the balance to which Brennan was entitled from the proceeds of the sale of his stock, after deducting the amount due from him to the bank on his note and overdrafts, he had successfully traced the balance of the trust fund thus due to him into the cash assets that came into the hands of the receiver, and was hence entitled to be paid the same as a preferential claim.

It is urged, however, in behalf of the receiver that the cash draft transactions should not be regarded as a transfer of $2,807.32 of this trust fund to the vaults of the Ironwood Bank, for the reason that, after the last of these cash drafts was drawn on May 8th, there remained to the credit of the Ironwood Bank at the Duluth Bank until May 10th a balance of $4,273.39, or more than the amount of the trust fund, which was not dissipated until this balance was changed into an overdraft of $1,068.75 on May 11th; the argument being that under this state of facts it should be presumed that the Ironwood Bank first drew on its open account in the Duluth Bank for its own purposes, intending to leave the trust fund unimpaired; that the $4,-

273.39 remaining in the Duluth Bank on May 10th hence included the trust fund; and that, as this balance was subsequently dissipated by drafts drawn by the Ironwood Bank for its own purposes, it cannot, for that reason, be traced into the cash which came into the hands of the receiver from the vaults of the bank.

[4] It is true that in the case of blended moneys in a bank account, consisting in part of trust funds, from which there have been drawings from time to time, it has been held, in favor of the cestui que trust, as a presumption of law, that the sums first drawn out were from the moneys which the tort-feasor had a right to expend in his own business, and that the balance which remained included the trust fund, which he had no right to use. In re Hallett's Estate, 13 Ch. D. 696, 727; Board of Commissioners v. Strawn, supra, at page 51. It is clear, however, in the first place, that this is a mere presumption, which will not stand against evidence to the contrary. Board of Commissioners v. Strawn, supra, at page 51.

[5] And it is furthermore clear that this rule of presumption has no application where the evidence shows that the first moneys drawn out of the mingled fund by the tort-feasor were not in fact dissipated by him at all, but were merely transferred, in a substituted form, to another fund retained in his own possession. In such case, it must be held that the trust attaches to the substituted form in which the property is retained by the tort-feasor, and that the right to follow the trust in such form is not lost by reason of the fact that the tort-feasor thereafter draws out and spends for his own purposes the balance of the fund in which the trust money was originally mingled. The English case of In re Oatway, L. R. 2 Ch. 356, 359, directly sustains this view. In that case Oatway, a joint trustee under a will, had sold a portion of the trust property and deposited the proceeds to his own credit in bank with other funds belonging to himself. Out of this deposit, consisting in part of the proceeds of the converted trust fund and in part of his own moneys, Oatway purchased certain shares of stock in the Oceana Company, which he took and retained in his own name. Thereafter he drew out and paid away irrevocably for his own individual purposes the entire remainder of the bank deposit. It was held that, under this state of facts, the cestui que trust was entitled to follow the shares of stock thus purchased by Oatway. Joyce, J., said:

"If money held by any person in a fiduciary capacity be paid into his own banking account, it may be followed by the equitable owner, who, as against the trustee, will have a charge for what belongs to him upon the balance to the credit of the account. If, then, the trustee pays in further sums, and from time to time draws out moneys by checks, but leaves a balance to the credit of the account, it is settled that he is not entitled to * * * maintain that the sums which have been drawn out and paid away so as to be incapable of being recovered represented pro tanto the trust money, and that the balance remaining is not trust money, but represents only his own money paid into the account. * * * It is, in my opinion, equally clear that when any of the money drawn out has been invested, and the investment remains in the name or under the control of the trustee, the rest of the balance having been afterwards dissipated by him, he cannot maintain that the investment which remains represents his own money alone, and that what has been spent and can no longer be traced and recovered was the money belonging to the trust.

\* \* \* The order of priority in which the various withdrawals and investments may have been respectively made is wholly immaterial. \* \* \* In the present case there is no balance left. The only investment or property remaining which represents any part of the mixed money paid into the banking account is the Oceana shares purchased for £2,137. Upon these, therefore, the trust had a charge for the £3,000 trust money paid into the account. That is to say, those shares and the proceeds thereof belong to the trust. The investment by Oatway, in his own name, of the £2,137 in Oceana shares no more got rid of the claim or charge of the trust upon the money so invested than would have been the case if he had drawn a check for £2,137 and simply placed and retained the amount in a drawer without further disposing of the money in any way. The proceeds of the Oceana shares must be held to belong to the trust funds under the will of which Oatway and Maxwell Skipper were the trustees."

In like manner we are of opinion that in the present case it must be held that the transfer by the Ironwood Bank to its own vaults, through the cash draft transactions, of $2,807.32, of the balance standing to its credit in the Duluth Bank in which the trust fund had been mingled, did not divest the money thus transferred of its character as a trust fund, but as this money remained thereafter in its own vaults and in its own custody, and subsequently passed into the hands of the receiver as part of the cash assets of the bank, it remained subject in all respects to the trust originally impressed upon the proceeds of the sale of Brennan's stock.

2. The court below correctly held that the amount of the $1,000 deposit was not a preferred claim, but that as to this sum Brennan was a general creditor of the Ironwood Bank, to be paid by the receiver the same percentage of dividends that had been and should be paid to other general creditors.

[6] It is true that where a bank, being hopelessly insolvent, receives a deposit, with the knowledge that it cannot pay its debts and must fail in business, this is such a fraud upon the depositor that he may rescind the contract of deposit and reclaim the amount so deposited or its proceeds, if traced into the assets of the bank coming into the hands of the receiver, in like manner as other trust funds. St. Louis Ry. Co. v. Johnston, 133 U. S. 566, 576, 10 Sup. Ct. 390, 33 L. Ed. 683; Standard Oil Co. v. Hawkins (C. C. A. 7) 74 Fed. 395, 398, 20 C. C. A. 468, 33 L. R. A. 739; City Bank v. Blackmore (C. C. A. 6) 75 Fed. 771, 773, 21 C. C. A. 514; Richardson v. Coffee Co. (C. C. A. 5) 102 Fed. 785, 789, 43 C. C. A. 583; Hutchinson v. Le Roy (C. C. A. 1) 113 Fed. 202, 209, 51 C. C. A. 159.

[7] However, the mere fact that the bank is known to be insolvent at the time the deposit is received is not in our opinion sufficient of itself, without more, to confer this right of rescission upon the depositor, and such right of rescission would not arise when the bank at the time of receiving the deposit, although embarrassed and insolvent, yet had reason to believe that by continuing in business it might retrieve its fortunes; the necessary condition upon which the right of rescission is predicated being that the deposit was received when the bank was hopelessly embarrassed and so circumstanced as to constitute its receipt of the deposit a fraud upon the depositor. See St. Louis Ry. Co. v. Johnston, supra, at pages 576, 577.

In the present case it merely appears that the bank was insolvent at the time this deposit was received, and had been known to be insolvent for ten years previously by the cashier who received the deposit. The extent of its insolvency at that time is not shown, nor is there any evidence as to what subsequent events precipitated the condition which caused its doors to close, or whether or not at the time the deposit was received the bank, although embarrassed and insolvent, yet had reasonable hopes that by continuing in business it might retrieve its fortunes, just as it had previously continued in business for the ten preceding years during which it had been insolvent. In the light of this meager evidence, we agree in the view expressed by Judge Denison, then district judge, who heard this case below, who said:

"There is no reason to think in this case that the suspension of the bank was any more imminent on April 8th than it had been for a long time, or that the cashier or bank officers anticipated the closing of the bank or had any expectation that complainant would not receive his money when he should ask for it—except their general and vague fear that they might fail to tide over their difficulties. This does not seem to me to raise the necessary trust. Complainant's own showing is that for more than 60 days the deposit would have been repaid on demand, and that it was practically offered to complainant when the note was renewed. For these reasons, I think complainant is not entitled to any preference upon his certificate of deposit, but should prove the same as a general creditor."

[8] And, whatever would have been the result otherwise, we think it cannot properly be held that the receipt of this particular deposit constituted a fraud upon Brennan within the rule entitling him to follow it as a trust fund, in the light of the undisputed facts, shown by his own testimony that at the time the deposit was made the bank held his $1,000 note for borrowed money, and the deposit was made with the "understanding" that it would be used in payment of this note at maturity. As this deposit was hence, under this evidence, in effect taken by the bank as quasi security for the payment of a just debt due to itself, this circumstance alone, in our opinion, relieves the bank from the imputation of fraud in receiving the deposit, which might otherwise have existed if the deposit had been merely received in the ordinary course of dealings between the bank and a customer not indebted to it.

[9] 3. It is furthermore suggested in behalf of Brennan that the court below should have allowed his $1,000 note as an offset against his claim as a general creditor under his certificate of deposit, instead of allowing it, in effect, as an offset against his preferred claim arising out of the sale of his collateral. It is frankly conceded, however, in the brief filed in his behalf that the opposite view was taken by his counsel in the court below, and it appears, from an examination of the pleadings, that the decree of the court below in allowing this offset against Brennan's preferred claim for the proceeds of his stock was entirely consistent with the prayer of the complainant's bill. Furthermore, Brennan, under his appeal, has assigned no error in reference to the action of the court in this respect. In this state of the record there is obviously nothing in the decree of the court below in this respect of which Brennan is entitled to now complain.

4. Finding no error in the decree below, it must be in all things affirmed. A decree will be entered accordingly, dismissing both appeals, and taxing each appellant with one-half of the costs of the appeals.