LOTHROP, County Treasurer, *v.* SEABORN, State Bank Examiner, Et Al., Respondents, and H. C. GUILD Et Al., Interveners.

No. 3026

July 7, 1933.             23 P. (2d) 1109.

*Gray Mashburn,* Attorney-General, and *John R. Ross,* District Attorney, for Appellant:

*Harwood & Diskin,* for Respondent E. J. Seaborn:

## OPINION

*Per Curiam:*

This case is before us on an appeal from a judgment and order in a suit instituted to have the county of Lyon in this state adjudged a preferred creditor in the matter of the failure of the Lyon County Bank, a corporation existing under the laws of this state. The lower court held that the deposits made in said bank by the county were not preferred. The appeal was heard upon an agreed statement of facts, which, so far as necessary here to state, are as follows: E. J. Seaborn at all times mentioned was and now is the state bank examiner. The Lyon County Bank suspended business upon the 16th day of February 1932, and said bank examiner took possession of the assets of the bank. Prior thereto plaintiff had deposited in open account in said bank to his credit the sum of $62,760.84. Plaintiff from time to time prior to the closing of the bank made withdrawals from his said deposit by checks on said account, and from time to time made additional deposits to his said account.

When the bank examiner took possession of the assets of the bank, he came into possession of the sum of $6,364.94 in cash. Among the assets coming into the possession of the bank examiner there was no distinguishable fund or sum of money in said bank earmarked or identified as the property of plaintiff. Prior to the time the bank examiner took possession of the assets of the bank, no demand had been made by plaintiff for the payment of said deposit.

Plaintiff filed a claim with the defendant bank examiner demanding that the amount of his deposit in the sum of $62,760.84 be allowed as a preferred claim. The

bank examiner disallowed this demand as a preferred claim, and allowed as an ordinary claim, without preference, for the sum of $62,010.84.

During all of the times mentioned herein, the Nevada Surety & Bonding Company, a corporation organized under the laws of this state and authorized to do a surety business, was the surety on the official bond of plaintiff as treasurer of Lyon County. The deposit of the money in the defendant bank as of February 16, 1932, by plaintiff, was secured by a depository bond issued by the Nevada Surety & Bonding Company in favor of plaintiff for the sum of $25,000, and conditioned that, if said bank failed to pay plaintiff's deposit therein on demand, said bonding company would pay the same to plaintiff. In addition to said surety bonds, the bank deposited with plaintiff, to secure the payment of said deposits, bonds of the Walker river irrigation district of the face value of $25,000, which are now in the possession of plaintiff, and on which since February 16, 1932, plaintiff collected the sum of $750 interest. Since the closing of said bank, the Nevada Surety & Bonding Company paid plaintiff on said depository bond the sum of $25,000.

The deposit of money in the bank, as aforesaid, was made without the unanimous written consent of the bondsmen on plaintiff's official bond, and the members of the board of county commissioners of Lyon County had no knowledge that the deposits were made in said bank without the unanimous written consent of the treasurer's bondsmen.

On the 29th day of October 1931, E. J. Seaborn, as bank examiner, notified the officers of the Lyon County Bank that the cash reserves were down, and that there was an impairment of the capital. He ordered the officers of the bank to repair the condition by assessment of the capital stock, and that the same must be done within sixty days. The assessment was not levied, and the bank continued in this same condition until the time of its closing. On and after December 29, 1931, the plaintiff deposited in said bank the sum of $5,870.46.

Two questions are presented for determination. They are: (1) May a county establish a preferential right to deposits in an insolvent bank under the doctrine of sovereign right of priority? (2) Does the law applicable to the facts of this case establish that the deposits when made created a trust relation between the county and the bank entitling the former to a return of the funds? We will consider these questions in their order.

1. For the purposes of this decision, we may assume without deciding, as we did in the case of State and George B. Russell v. Carson Valley Bank, 23 P. (2d) 1105, this day decided, that the so-called prerogative of the sovereign is a right which the state has derived from the common law. But even so it does not follow that the counties of the state have the same right. That counties have no such right is, we think, established by reason and the great weight of authority. Bignell v. Cummins, 69 Mont. 294, 222 P. 797, 799, 36 A. L. R. 634; Glynn County v. Brunswick Terminal Co., 101 Ga. 244, 28 S. E. 604; United States Fidelity & G. Co. v. Rainey, 120 Tenn. 357, 113 S. W. 397; Calhoun County Court v. A. G. Mathews, Receiver of People's Bank of Grantsville, 99 W. Va. 483, 129 S. E. 399, 401, 52 A. L. R. 751; Board of Com'rs., San Miguel County, v. People's Bank & Trust Co. et al. (Melaven, Intervener) 34 N. M. 166, 279 P. 60, 62; Ætna Casualty & Surety Co. v. Bramwell (D. C.) 12 F. (2d) 307, 310; 3 Michie on Banks & Banking 233.

The reason for the rule that counties are not invested with the state's preferential right as to deposits in insolvent banks is stated in Bignell v. Cummings, supra. The court said: "Sovereignty must involve the general interest of the state at large. It is true that the whole state has an interest in the proper administration of its laws everywhere within its borders and so it has an interest in the proper government of every county, and so it has in every municipality and in the conduct of every school district and in the prosperity of every citizen. But while the prerogative of the state may be invoked

for the protection of the rights of the county, municipality, school district, and citizen, it does not follow that any of these possess that power. It must be held that the sovereign right, the prerogative, is lodged in the political power which is created by and is the representative of all the people—the state itself, and that the prerogative of the state may not be exercised by its creature in the absence of express authority granted to the creature. Granting that the county is an arm of the sovereignty, an agent of the state, an auxiliary and necessary to the proper functioning of the state government, it must be conceded that the county is. only a creature of the state which may be abolished at will by the state."

In County of Glynn v. Brunswick Terminal Co., supra, the court said:

"While it may be true that the state, on account of its prerogative right, has this preference, we cannot hold that the same right applies to the counties of the state. If there is such a thing as prerogative right of preference on the part of the state, it cannot be divided among the 137 counties of which it is composed. 8 Bac. Abr., under head 'Prerogative.'

"We think it safe to hold that the county has no such prerogative right as the state. Not having this right, in order to obtain a preference over the other depositors it must show some statutory right. * * * In the absence of any legal right of preference in such cases, the county must stand upon an equal footing with other depositors."

After referring to a number of authorities holding the same view, the court in Board of Com'rs. v. People's Bank & Trust Co., supra, stated: "We find ourselves in accord with it," and added: "However we may be bound in New Mexico by the common-law rule applying to the state itself, we surely are not bound to extend that rule, thus giving it an application unknown to the common law, and involving new consequences in public policy."

The court in Ætna Casualty & Surety Co. v. Bramwell, cited above, said: "The argument is persuasive and compelling to my mind that common-law prerogative is an attribute of sovereignty, and that the state alone possesses the right and may exercise it. It may, if it choose, devolve upon the counties the right of prior preference by appropriate legislation; but this would not be tantamount to conferring upon them the prerogative power or privilege of the state. The counties would have to depend upon the statute for their preference right; they cannot avail of the common law."

Plaintiff cites the case of City and County of Denver v. Stenger (C. C. A.), 295 F. 809, in support of his contention that a county has a preferential right on the theory of the state's prerogative. But, as declared in Ætna Casualty & Surety Co. v. Bramwell, supra, this case is now shorn of application by reason of the fact that Colorado has since the decision of that case denied the common law prerogative right to the state. United States Fidelity & Guaranty Co. v. McFerson, 78 Colo. 338, 241 P. 728. The case of In re Marathon Savings Bank, 198 Iowa, 692, 196 N. W. 729, 200 N. W. 199, in which the court held that a statute giving preferential claims in favor of the state, county, or other municipal corporation was declaratory of the common law, is also cited. Aside from the two cases, there is a general unanimity of the judicial opinion holding that the state's prerogative as to a priority right to public funds is not shared by a county. As stated in Calhoun County Court v. A. G. Mathews, Receiver of the People's Bank of Grantsville, supra, the court said: "The sovereignty of the King was a united, entire, and indivisible sovereignty."

The court in that case said further: "We find no case under the common law conceding sovereignty to a political division or municipality of England."

If this be a correct exposition of the common law pertaining to sovereignty, as we think it is, how can it be said that, when this state adopted the common

law, it gave the counties of the state a preferential right in respect to public funds? Under our constitution, all political power is inherent in the people. Article 1, sec. 2, State Constitution. They are the state itself, which alone inherited from the common law the prerogative of sovereignty, if such was the effect of our adoption of the common law.

2. There is no statute in this state giving a county which is a depositor in a bank any preference over general depositors. As Lyon County has no preference right through the so-called prerogative of the sovereign, and no statutory right to have its funds deposited in the bank declared a preferred deposit, do the facts and the law establish a trust fund in its favor? We think not.

It is contended that the deposits were wrongfully made, in that the appellant did not have the unanimous written consent of his bondsmen to make such deposits. This contention is grounded on the provisions of section 2187 N. C. L., which authorizes the county treasurers of the several counties, when a private or incorporated bank is located at the county seat, to deposit, with the unanimous consent of their bondsmen, county funds in such bank or banks; and, when no such bank or banks exist at such county seat, to deposit, with the unanimous consent of their bondsmen, county funds with any private or incorporated bank in the State of Nevada. It will be observed that the statute does not require the written consent of such bondsmen.

It appears from the agreed statement of facts that at all times while the deposit was in said bank the Nevada Surety & Bonding Company, a corporation organized under the laws of Nevada, was the surety on the official bond of appellant as treasurer of Lyon County. It also appears from such statement that the deposit of the money in the bank as of February 16, 1932, by appellant was secured by a depository bond issued by said Nevada Surety & Bonding Company in favor of plaintiff. This manifested the consent required

by said section. We find no statute which made the. deposit unlawful. A trust ·fund cannot therefore be predicated on the violation of a statute.

3. It is further contended by plaintiff that he has a preferred claim for $5,870.46 deposited in the bank after December 29, 1931, because this deposit was made at a time when the bank was insolvent. The trial judge denied this contention on the ground that it was not disclosed by the evidence that the bank was hopelessly insolvent when the latter deposit was made. We think the court was right as to the fact and the law concerning it. Mere insolvency of a bank when a deposit is received is not sufficient ground to enable the depositor to rescind the contract of deposit and thereby impress the amount with a trust. It is well established that this will result only when the bank is hopelessly insolvent at the time the deposit is made. Brennan v. Tillinghast (C. C. A.), 201 F. 609, 615, and cases cited therein. In the foregoing case the court said: "However, the mere fact that the bank is known to be insolvent at the time the deposit is received is not in our opinion sufficient of itself, without more, to confer this right of rescission upon the depositor, and such right of rescission would not arise when the bank at the time of receiving the deposit, although embarrassed and insolvent, yet had reason to believe that by continuing in business it might retrieve its fortunes; the necessary condition upon which the right of rescission is predicated being that the deposit was received when the bank was hopelessly embarrassed and so circumstanced as to constitute its receipt of the deposit a fraud upon the depositor."

See, also, Atlantic & Pacific Tea Co. v. Citizens' National Bank et al. (D. C.), 2 F. Supp. 29.

The federal rule evidenced by the foregoing cases is reasonable and is accepted by state courts. Beehive Marketeria v. Citizens' Bank of Georgetown et al., 126 Wash. 526, 218 P. 237; Steele v. Commissioner of Banks, 240 Mass. 394, 134 N. E. 401, 402, 20 A. L. R. 1203.

In the latter case it is said: "A bank hopelessly insolvent, receiving deposits from those who confide in its good reputation or in its representations, is held to knowledge that it cannot meet its obligations. Taking deposits under such circumstances is the equivalent of a preconceived purpose not to pay and is a fraudulent act. The contract of deposit may be rescinded by the depositor and the deposit, or its proceeds, if traced, may be recovered in like manner as other trust funds. On the other hand, simple insolvency, even of a bank, does not warrant the rescission of deposits if there are genuine and reasonable hope, expectation and intention on the part of the officers of the bank to carry on its business and to recover sound financial standing. To warrant such rescission there must be the further fact that it is reasonably apparent to its officers that the concern will presently be unable to meet its obligations as they are likely to mature and will be obliged to suspend its ordinary operation."

The most that is disclosed by the agreed statement of fact is that the bank was insolvent when the deposit of $5,870.46 was made. Under the rule this is not sufficient.

It is ordered that the judgment and order appealed from be affirmed.