BOARD OF COM'RS OF CRAWFORD COUNTY, OHIO, v. STRAWN.

(Circuit Court of Appeals, Sixth Circuit. November 20, 1907.)

No. 1,675.

1. TRUSTS—UNLAWFUL DEPOSIT OF MONEY BY COUNTY OFFICER—TRACING OF FUND.

Under the statutes of Ohio a county treasurer has no authority to deposit taxes collected as a general deposit in a bank, and the bank can acquire no title to money so deposited as against the county, nor can an estoppel arise from any act of its officers which will prevent its recovery of such money from a receiver of the bank when it can be identified or traced into other property where it has been mixed with funds of the bank.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 47, Trusts, § 526.]

2. SAME—MINGLING OF FUNDS BY TRUSTEE—PAYMENTS FROM COMMON FUND.

The rule that, where a bank has mingled trust money with its own funds, money paid out from such fund for its own purposes will be presumed to have been paid from its own money, and not from the trust fund, is qualified by the further rule that, if the mingled fund is reduced at any time below the amount of the trust fund, the latter must be regarded as dissipated, except as to such balance, and sums subsequently added from other sources cannot be treated as a part of the trust fund.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 47, Trusts, §§ 520-525.]

3. SAME—RIGHT TO RECOVER TRUST FUND—NECESSITY OF TRACING.

The mere misapplication of a trust fund does not create a general lien on the tort-feasor's estate, but, to entitle the owner to recover such fund from a receiver of the trustee, it must be traced either in its original form or into specific property which passed to the receiver.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 47, Trusts, § 553.]

4. SAME—SUIT AGAINST RECEIVER—UNLAWFUL DEPOSIT OF PUBLIC MONEY.

The cashier of a national bank in Ohio, at the time it went into the hands of a receiver in insolvency, was a deputy county treasurer, and had for some time previously been collecting taxes at the bank, which were deposited in the bank to the credit of the treasurer, and mingled with the bank's funds. Neither of such officers had any power under the law

157 F.—4

to make such deposits nor to part with title to the money. Of the funds of the bank with which such taxes were mingled, a certain amount, less than the trust funds, remained on hand at all times, and there was a still larger amount in the fund when the receiver was appointed. *Held,* that the county was entitled to recover from the receiver, as a part of the trust fund, so much of the cash taken possession of by the receiver as equaled the lowest cash balance remaining in the bank at any time while the taxes were being collected, together with the collections subsequently made, but that it could not recover the proceeds of commercial paper acquired by the bank during such time and collected by the receiver, without establishing by proof that the tax money, or the fund in which it was mingled, in fact went into such paper.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 47, Trusts, § 553.]

Appeal from the Circuit Court of the United States for the Northern District of Ohio.

For opinion below, see 149 Fed. 229.

C. H. Henkel and A. M. Snyder, for appellant.

W. J. Geer and W. M. Duncan, for appellee.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge. The object of this bill is to collect from the receiver of the Galion National Bank the sum of $48,289.17; that sum being public taxes collected by the cashier of the bank while acting as a regularly appointed deputy of the county treasurer, and which sum stood as a general deposit to the credit of the county treasurer on the books of the bank when closed by the Comptroller and placed in the hands of a receiver. The funds of the bank are wholly insufficient to pay creditors in full, and the object of this bill is to have this claim declared a prior lien upon the assets in the receiver's hands, or, if not a lien and charge upon the entire assets, to follow the fund in so far as it can be traced. The ordinary relation of debtor and creditor did not exist between the bank and the county treasurer, because a county treasurer in Ohio is positively forbidden, except under circumstances which did not exist in this instance, to make a general deposit in any bank of taxes collected. Bates' Ann. St. Ohio, §§ 6,841 and 1,136 (1) to (9). But the authority of the county treasurer to appoint Blythe, the cashier of the bank, a deputy collector is not doubted. The statute law of Ohio, however, requires the county treasurer to keep his office in rooms provided at the county seat, and that all public money in his possession shall there be kept. It was, therefore, the plain duty of Blythe when he collected taxes to pay the same forthwith to his principal, and of the latter to keep the taxes so collected in his office. Blythe had, therefore, no authority to deposit the funds as a general deposit with the Galion Bank, and the latter was bound to know that it could not receive and mingle this fund with its general moneys. Merchants' Nat. Bank v. School District No. 8, 94 Fed. 705, 36 C. C. A. 432. Under the settled doctrine, the bank acquired no title to the public fund, and the public can recover the same, so far as it can be identified or traced into property which has come into the receiver's possession. That the county treasurer and the county commissioners had knowledge of this deposit, and that it was in pursuance of a course of business pursued for several years in succession without objection,

does not operate as an estoppel; for there being originally no authority to violate the positive provisions of the statute in either or all of these officials, no consent or acquiescence on their part will cure the title of the bank. The tax money, as it came into the bank's possession, was mingled with the bank's own funds and checks or other liabilities paid out of the general mass from day to day in the general course of business. The entire amount of the claim here asserted is for deposits made on account of taxes collected which fell due in 1903. The first item in the credit account is dated October 8, 1903, and the last February 2, 1904. When the bank closed on February 15, 1904, there was to the credit of the county treasurer $48,289.17. But the money of the bank, which was turned over to the receiver, was only $20,277.01. The mere fact that this tax fund, which, for short, we shall call the "trust fund" had been blended with the moneys of the bank does not fasten a lien upon the balance which the bank had on hand when its doors were closed. If trust moneys be wrongfully invested in bonds, or stocks or realty, or promissory notes or bills, and the particular property into which the trust fund has been changed can be ascertained, the owner may take the property and ratify the investment. Or, if the trust funds, along with the property of the trustee or bailee, be invested in an ascertained property, equity will follow the trust fund, not by taking the entire property, for that would be unjust, but by fastening a charge upon the property to the extent of the trust fund therein discovered. The blending of the trust money with the money of the trustee was suffered at one time to defeat the owner's title and compel him to stand as a mere unsecured creditor. This was upon the idea that money was not earmarked, and, therefore, could not be recovered in specie. But the later cases have met this difficulty in the case of blended moneys in a bank account, from which there have been drawings from time to time, by the fiction that the sums thus drawn out were from the moneys which the tort-feasor had a right to expend in his own business, and that the balance which remained included the trust fund which he had no right to use. It was upon this fiction that Knochball v. Hallett, 13 Ch. Div. 696, 726, et seq., was decided. That case was approved in National Bank v. Insurance Company, 104 U. S. 54, 26 L. Ed. 693, and has been followed in many subsequent cases when the trust fund has consisted of moneys on deposit. Smith v. Mottley, 150 Fed. 266. But as this is a mere presumption it will not stand against evidence. It is, therefore, a part of the rule applicable to following misappropriated moneys into a bank account that, if at any time during currency of the mingled account the drawings out had left a balance less than the trust money, the trust money must be regarded as dissipated except as to this balance, the sums subsequently added to the account from other sources not being attributed to the trust fund. See the cases cited above and the following: Beard v. Independent District, 88 Fed. 375, 31 C. C. A. 562; Boone County Bank v. Latimer (C. C.) 67 Fed. 27; and Spokane County v. Bank, 68 Fed. 979, 16 C. C. A. 81. This side of the rule is peculiarly sound when it is sought to obtain an advantage in the distribution of the assets of an insolvent national bank. So long as the claim to advantage is bottomed upon the fact that the receiver has re-

ceived money or property into which the money of the claimant is shown to have gone the equity is a strong one, and, to the extent that the assets which have come into the hands of the receiver are shown to have been augmented by the receipt of the trust fund or its actual proceeds, other creditors should not complain if that is returned to which neither the bank nor its receiver had any just title.

The equitable principles applicable to the facts of this case must operate to deny any general charge upon either the money or other assets of the bank in possession of the receiver, and deny complainants relief in respect of the moneys in the vaults of the bank when it closed, except in so far as the county has shown, aided by the presumption as to the money used in drawings from the general fund with which the trust fund was blended, that its money has come into the possession of the receiver. Now, the books of the bank show that on February 1, 1904, the moneys in the vaults of the bank had been reduced to $11,652.25. Between that date and February 15, 1904, there was deposited only $45.36 on account of taxes collected. But the moneys deposited by other customers, over and above daily disbursements, increased the cash balance on hand to $20,275.01—the amount on hand when the bank was closed February 15th. It is, therefore, demonstrated that every dollar of this trust fund had been actually paid out and dissipated by February 1st except this balance of $11,652.25, plus $45.26 of taxes deposited later. Only to the extent of this sum of $11,697.61 has the complainant identified the money which came into the receiver's hands as part of the trust fund, and only to that extent was there an actual augmentation of the moneys which came to the possession of the receiver. The decree below limited the complainant to the recovery of this identified money so far as this part of the case goes, and to that much of the decree we agree.

But the complainant assigns as error that the court did not extend this rule to the balances to the credit of the Galion Bank in banks with which it kept a deposit account. The balances to the credit of the Galion Bank in these banks which have been received by the receiver aggregate something over $6,000. The balances with these several banks was shifting from day to day during the currency of the tax deposit account. The credits given to the Galion Bank are shown to have sometimes come from collections, sometimes from proceeds of rediscounts, and sometimes from moneys sent from the vaults of the Galion Bank to these reserve or corresponding banks. On the other hand, the account was drawn against when exchange was sold and for other purposes. The trust fund is not traced into any of the rediscounts or collections, which in part made up the credits in these banks. That the moneys remitted were not out of the trust fund is to be presumed; for the presumption upon which equity acts in respect of the character of the funds drawn out of the mingled mass of money in the bank's vaults is that the bank drew out only its money, leaving in its vaults the money which it was obligated to retain and not use for any private purpose. The court below was right in holding that no part of the money deposited with the corresponding banks and which has come to the receiver's possession has been identified.

The third and last question arises upon an error assigned by the ap-

peal of the receiver. The facts necessary to be stated are these: Between the opening of this tax deposit account and the closing of the bank on February 15, 1904, the transactions of the bank aggregated about $8,000,000. During that period, commercial paper aggregating about $142,000 was acquired by the bank, which has come to the hands of the receiver. The amount collected by the receiver from this paper is $11,588.71. This being the residue after deducting amounts paid to redeem part of this paper held as collateral by reserve banks. The court below held that this paper was acquired by the application of the general funds of the bank with which the tax fund had been blended, and that the county was entitled to a general lien upon the proceeds of this paper already collected, and to such additional sums as the receiver should later collect, until the entire tax money should have been repaid. Thus the court below declared a general lien upon all of the assets of the bank acquired between October 8th, and February 15th. This paper consists of, perhaps, 100 distinct bills and notes, and each seems to have been a separate transaction. The fund collected comes from the payment of a few of these bills and notes. Upon the great mass of this paper nothing has been collected, and little more is likely to be. The assumption that all of these bills and notes were bought and paid for by the actual application of the money in the vaults of the bank with which the trust fund money has been mingled, or for loans made out of that fund, is not borne out by the evidence. Some of the transactions did not involve the actual payment of any money out of the funds of the bank, inasmuch as the proceeds would be passed to the credit of the party procuring the discount. In some cases the credit thus obtained was possibly drawn upon afterwards. The bank officers were unable to point out a single piece of this commercial paper in the receiver's possession as having been acquired by the actual use of the blended money of the bank and the county. The most that can be made out of the facts in respect to the consideration for this mass of commercial paper is that some of it was doubtless so paid for, while other paper represents mere book credits and did not lessen the cash of the bank a dollar. Some of this paper, as shown by the date of its execution, was acquired after the cash in the bank had been reduced to its lowest point on February 1, 1904. Paper taken after that date was therefore acquired, if its acquisition involved the paying out of money, with the money of the general depositors with which the county fund had not been blended. The residue of the bank's funds on February 1, 1907, was $11,652.25, and we here affirm the decree of the court below which returned that residue to the county, as its identified money. It would be a gross inconsistency to say that this residuum not only remained in the vaults of the bank and passed to the receiver's possession, but that it had been traced also into commercial paper thereafter acquired. Either no part of the money in the hands of the receiver is the money of the county, or no part of the county's money went into such paper after February 1st. Now, of this mass of $142,008.20 worth of paper, which is shown to have been acquired during the currency of this tax deposit account, more than $60,000 appears to have been acquired after February 1st, and more than one-half of the total collections made by the receiver come from

that paper. But if this logic is unsatisfactory, and we are to infer that the whole of this residuum of February 1, 1904, did go into this paper bought after that date, then, as that sum has been returned "as money," complainants will have reclaimed every dollar which, on this presumption, went into paper acquired after that date, and has no cause to complain. Without going more into detail, it is enough to say that the evidence does not satisfy us that all or any large part of this mass of paper was acquired by the use of the moneys of the bank with which this trust fund had been mingled, and certainly there is no evidence pointing to an investment of the mingled fund in any specific bill or note, so that we might determine the extent to which the assets which the receiver holds have been augmented by the receipt of any bill or note in part acquired by the trust fund. But aside from this view of the evidence, the claim to a general charge upon any and all property acquired by the bank, through the use of the general funds of the bank with which this trust fund had been blended, is not supported by the weight of authority, nor do the cases decided by this court go so far. That the misuse of this trust fund has gone to swell, in one form or another, the general assets of the bank is not enough to charge the whole with a lien, will not be seriously contested. The cases which deny such a contention are numerous. To impress a trust upon the property of a tort-feasor who has used the trust fund in his private affairs, it must be traced in its original shape or substituted form. City Bank v. Blackmore, 75 Fed. 771, 21 C. C. A. 514, In re Taft, 133 Fed. 511, 514, 66 C. C. A. 385, Erie Ry. v. Dial, 140 Fed. 689, 691, 72 C. C. A. 183, Smith v. Mottley, 150 Fed. 266, 80 C. C. A. 154, and Smith v. Township of Au Gres, 150 Fed. 257, 80 C. C. A. 145, are cases decided by this court, which recognize that the mere misapplication of a trust fund does not create a general lien upon the tort-feasor's estate. In other courts, the question has been presented more squarely for a decision, and supports the rule that an identification of the fund itself, or a tracing into some specific property, is essential to reach the property of a wrongdoer, either in the hands of an assignee, trustee, receiver, or under a lien fastened by a creditor. Peters v. Bain, 133 U. S. 670, 693, 10 Sup. Ct. 354, 33 L. Ed. 696; Board of Fire & Water Commissioners v. Wilkinson, 119 Mich. 655, 78 N. W. 893, 44 L. R. A. 493; In re Mulligan (D. C.) 116 Fed. 715; Gianella v. Momsen, 90 Wis. 476, 63 N. W. 1018; Little v. Chadwick, 151 Mass. 109, 110, 23 N. E. 1005, 7 L. R. A. 570. Taylor v. Plumer, 3 M. & S. 562, is a case which has been questioned only as to the difficulty there referred to arguendo of following money mingled with the agent's own money. Carmany's Appeal, 166 Pa. 622, 31 Atl. 334; Cavin v. Gleason, 105 N. Y. 257, 11 N. E. 504; Arbuckle v. Kirkpatrick, 98 Tenn. 221, 229, 39 S. W. 3, 36 L. R. A. 285, 60 Am. St. Rep. 854; Spokane County v. Clark (C. C.) 61 Fed. 538, affirmed by the Circuit Court of Appeals for the Ninth Circuit, 68 Fed. 979, 991, 992, 16 C. C. A. 81; Beard v. Independent District, 88 Fed. 375, 31 C. C. A. 562; Richardson v. New Orleans Debenture Redemption Co., 102 Fed. 780, 42 C. C. A. 619, 52 L. R. A. 67; Spokane County v. First Nat. Bank, 68 Fed. 979, 982, 991, 992, 16 C. C. A. 81; Multnomah County v. Oregon Nat. Bank (C. C.) 61 Fed. 912; Commercial Nat.

Bank v. Armstrong (C. C.) 39 Fed. 684, 692; and Frelinghuysen v. Nugent (C. C.) 36 Fed. 229.

Peters v. Bain, 133 U. S. 671, 678, 693, 10 Sup. Ct. 354, 33 L. Ed. 696, is a very close authority upon the facts of this case. There the moneys of a national bank had been obtained and used in breach of trust by a firm of private bankers. Both failed; the firm after a general assignment. The receiver of the national bank sought to impress with a trust the entire property of the firm in the hands of its assignee. It was shown that the bank's money had been used exclusively in the purchase of certain property. It was sought, also, to impress a lien upon other property which had been "paid for by the firm out of the general mass of moneys in their possession, and which may or may not have been made up in part of what had been wrongfully taken from the bank." Waite, C. J., heard the case on circuit, and, as to this class of property, said:

"There the purchases were made with moneys that cannot be identified as belonging to the bank. The payments were all, so far as now appears, from the general fund then in the possession and under the control of the firm. Some of the money of the bank may have gone into this fund, but it was not distinguishable from the rest. The mixture of the money of the bank with the money of the firm did not make the bank the owner of the whole. All the bank could, in any event, claim would be the right to draw out of the general mass of money, so long as it remained money, an amount equal to that which had been wrongfully taken from its own possession and put there. Purchases made and paid for out of the general mass cannot be claimed by the bank, unless it is shown that its own moneys then in the fund were appropriated for that purpose. Nothing of the kind has been attempted here, and it has not even been shown that, when the property in this class was purchased, the firm had in its possession any of the moneys of the bank which could be reclaimed in specie. To give a cestui que trust the benefit of purchases by his trustees, it must be satisfactorily shown that they were actually made with the trust funds."

The opinion of the Supreme Court was by Fuller, Chief Justice, who affirmed the Circuit Court, and overruled the claim of a general charge, saying that "purchases made and paid for out of the general mass cannot be claimed by the bank, unless it is shown that its own moneys then in the fund were appropriated for that purpose." The contention that the cases of Smith v. Mottley and Smith v. Au Gres, decided by this court, sustain the decree below in giving a general lien upon all the bills and notes acquired by the bank during its custody of the tax deposit, is a misapprehension. Smith v. Mottley was this: Miss Smith owed a sum of money to Miss Wintersmith. When the note fell due she paid into Mottley's bank the amount of the note, the bank claiming authority to collect the same, and that it would obtain the note and deliver it to her. Within 10 days the bank failed. The money so paid into the bank was placed upon the books of the bank to the credit of the payee. When Miss Wintersmith learned of the transaction, she repudiated the authority of the bank to collect her debt from Miss Smith. The latter filed her petition in the bankrupt court, and asked that her claim against Mottley's bank be paid in preference. From the time the bank wrongfully received Miss Smith's money until the time its doors were closed, its general cash balance was never below the amount of Miss Smith's claim, and a

sum of money in excess of her claim passed to the bankrupt's trustee. The court held that upon these facts the fund in the trustee's hands had been augmented to the full amount of this trust fund. Thus, neither the facts of the case nor the conclusion of the court justify the contention now made. The opinion cites and reaffirms earlier opinions by this court, including City Bank v. Blackmore, 75 Fed. 771, 773, 21 C. C. A. 514, and In re Dial, 140 Fed. 689, 691, 72 C. C. A. 183; in both of which cases we had to deal with the question of the extent of a reclamation when it was sought to follow the property of the owner into the hands of a receiver or bankrupt trustee. In the Blackmore Case, it was sought to fasten a general charge upon the assets in the hands of a national bank receiver, because there had been an unauthorized use of the claimant's property or funds by the bank. Touching the necessity of either identifying the owner's property in the hands of the receiver or showing that the assets which had come into his hands had been definitely augmented by property into which it had gone, this court, speaking by Judge Taft, said:

"It may not be necessary to show earmarks upon the proceeds of the thing parted with to justify such a remedy; but it must at least appear that the funds in the hands of the receiver were increased or benefited by the proceeds, and the recovery is limited to the extent of this increase or benefit. In every case relied upon by counsel for appellant, recovery, if decreed, was based on the fact that the property in the hands of the assignee or receiver of the person or bank against whom the claim of fraud, right to rescind, and priority of distribution was made, included in its mass either the very thing parted with or its proceeds. Railroad Company v. Johnston, 133 U. S. 573, 10 Sup. Ct. 390, 33 L. Ed. 683; Armstrong v. Bank, 148 U. S. 50, 13 Sup. Ct. 533, 37 L. Ed. 363; Cragie v. Hadley, 99 N. Y. 131, 1 N. E. 537, 52 Am. Rep. 9. The exact question is discussed with satisfactory fullness in Bank v. Latimer, (C. C.) 67 Fed. 27; and the necessity for the presence of the proceeds of the very thing obtained by fraud in the mass of assets to be distributed is clearly pointed out."

The opinion in Re Dial was announced by the same member of the court who wrote the opinion in Smith v. Mottley, as well as the opinion in the Au Gres Case, to which we shall refer later. That was a case where certain rubber, to which the bankrupt had no title, had been wrongfully used and made up into tires. Bankruptcy ensued. The owner of the rubber, by petition, asserted his right to the rubber and to follow it into the tires into which it had gone. It appeared that this rubber had been worked into tires, and that rubber of the bankrupt had been worked into other tires, and the tires made from both had been so intermingled that those made from the petitioner's rubber could not be distinguished from those made from the bankrupt's rubber. In this condition some of these tires came into the possession of the bankrupt's trustee. We held that, under such circumstances, the petitioner was entitled to enforce a charge against the tires which had passed to the trustee, to the extent that the assets had been augmented by the rubber of the petitioner, and ordered an account. Upon the necessity of tracing the trust fund into the trustee's possession, we said:

"We recognize that the rule only permits the following of the converted property into assets which can be traced as proceeds, and that the lien does not attach to assets in which neither the thing nor its value can be found."

In the Au Gres Case it was shown that a township treasurer had used the public funds in his hands in buying additional merchandise, and adding the same to his stock as a general merchant. He became bankrupt, and this stock of merchandise thus augmented went into the possession of the trustee. The particular items which had been paid for and added to the general stock were not ascertainable, but this court held that the misappropriated trust fund, having been traced into the general stock, constituted a prior lien and charge upon the stock as a unit. This case proceeds upon the theory that a stock of merchandise constitutes a subject which is capable of being sold or mortgaged as an entirety, and in the latter case the mortgage is not invalid if it provides for a continuance of the business, merchandise added from time to time to take the place of that sold passing under the mortgage. It is quite distinguishable from the case at bar, where it is sought to fasten a trust fund upon hundreds of distinct pieces of commercial paper made by many different persons and acquired at different times, because it is probable that some of such bills or notes were acquired with the general funds of the bank with which had been mingled some part of complainants' tax deposits. See text 6 Cyc. 1041, "Future Interests," and cases cited in notes following.

Complainants have not shown that any single piece of that mass of bills and notes was acquired with the blended moneys of the bank and of the tax fund, still less are they able to show that the assets in the receiver's hands have been actually augmented by a dollar collected from paper so paid for by the mingled fund.

The decree must be modified as to this, and affirmed as to all other matters. Costs of this court will be divided.