**BLAIR, Commissioner of Internal Revenue, v. DUSTIN'S ESTATE.**

**ARCHBOLD v. BLAIR, Commissioner of Internal Revenue.**

Circuit Court of Appeals, Second Circuit. February 18, 1929.

Nos. 124, 135.

Vincent J. Heffernan, of Washington, D. C., Mabel Walker Willebrandt, Asst. Atty. Gen., Sewall Key and J. Louis Monarch, Sp. Asst. Attys. Gen., C. M. Charest, Gen. Counsel, and Irwin R. Blaisdell, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for Commissioner of Internal Revenue.

John G. Jackson, of New York City, and William H. White, Jr., of Washington, D. C., for executors.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge. The decedent, Dustin, was the wife of one Archbold, who died, bequeathing to her certain personal property, on which his executors paid the estate tax, and among which were shares of stock, on which after his death the companies declared "rights"; that is to say, they allowed shareholders to subscribe for new shares upon the payment of less than their market value. Archbold's executors, in the case of some of these shares, paid the subscriptions out of his estate, charged the payments against the widow's interest, and took up the shares; in the case of other shares, she paid the subscription out of her own money. The widow remarried, and died within five years of Archbold's death, and her executors, the taxpayers now at bar, sold some of the bequeathed property, not the shares in question, and put the proceeds in a bank account, with which they mixed other funds of hers.

The old shares bequeathed by Archbold fell in value after his death, so that with one exception the sum of their value at her death with the value of the new shares, less the subscriptions, is less than the original value of the old shares. The executors assert that they may treat the new shares as part of the old, and that both are exempt from the estate tax up to the original value of the old shares. The subscriptions they do not apparently claim to be exempt, even when paid out of Archbold's estate. The Board of Tax Appeals decided the point against the executors, who appeal.

The expenses of the administration of Annie M. Dustin's estate and certain of her charitable bequests were paid from the account, made up as we have said, leaving, however, more than enough to cover the proceeds of the bequeathed property. The Commissioner insisted that it was impossible to say that the money had not been withdrawn from the bequeathed funds, and that, as the statute, section 403 (a) (2) of the Revenue Law of 1921, 42 Stat. 279, allowed a deduction only in case the property bequeathed had not been used to pay for the costs of administration or charitable bequests, section 403 (a) (1) and (3), no part of what remained

in the bank account should be deducted. The board allowed the deduction, and this is the Commissioner's appeal.

On the first point it seems to us that the value of the new shares, so far as it does not arise from the subscriptions, is to be taken as part of the original shares bequeathed and taxed. The board so treated certain stock dividends declared after Archbold's death, on the theory that the aggregate of the old and new certificates represented the same interest in the corporate assets as the old shares alone. Gibbons v. Mahon, 136 U. S. 549, 10 S. Ct. 1057, 34 L. Ed. 525; Eisner v. Macomber, 252 U. S. 189, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570; McDonald v. Maxwell, 274 U. S. 91, 47 S. Ct. 497, 71 L. Ed. 942, 55 A. L. R. 705. From this ruling the Commissioner did not appeal, and with it he is presumably content; we do not see why there should be a distinction in the case of "rights." The issuance of new shares left the aliquot interest of each shareholder in the whole corporate assets just what it was before, though these had been increased by the subscriptions. Thus the "rights" represented exactly that part of the old corporate assets which the old shares lost because of their "dilution"; the balance of the new shares represented the subscriptions. The question is whether the new shares pro tanto "can be identified as having been acquired in exchange for property so received." Section 403 (a) (2). Formally, perhaps, there has not been an "exchange"; but the identity is established beyond peradventure.

Such "rights" are not treated as income per se. Miles v. Safe Deposit Co., 259 U. S. 247, 42 S. Ct. 483, 66 L. Ed. 923. When sold, any gain or loss is calculated as follows: The sale price of the "right" is added to the subscription, thus making the total value of the new share (we assume a duplication of the original shares). Its cost is found by adding the subscription to the value of the old share and dividing the sum by two. This method presupposes that the "right" is still a share in the old assets, and it appears to us insubstantial to stand upon the formality of an "exchange," stricti juris.

The aggregate of the value of the old shares and the "rights" must, of course, not exceed the value of the old shares at the time of Archbold's death (section 403 (a) (2), and in the case at bar the appellants claim no more in the single instance when the old shares were worth less. Nor do they claim the amount of such subscriptions as were paid by Archbold's executors and charged against the widow's interest. As to whether they might, we express no opinion; but we think the deduction, so far as claimed, should have been allowed.

The second point raises the question, familiar in other situations, of how to allocate payments made out of a mixed fund. We do not understand it to be disputed that, if the executors had deposited the proceeds of the bequeathed property in one account and other property in another, they would have had an option to pay charitable bequests and administration expenses as they chose, and that any deduction under section 403 (a) (2) would have depended upon which they selected. Again, had they withdrawn from the mixed fund an amount equal to the bequeathed property, and deposited it elsewhere as such, there would be no question that what was left had not been bequeathed. Finally, had they, at the time of making the payments in question, announced that they were not paying out of the bequeathed property, it would also have been enough; they need not have gone through an idle form. In short, it is a question merely of their expressed intent, and so perhaps the Commissioner concedes, for he urges that there is no evidence of what they meant to do.

The executors expressed their intent only by the withdrawal of money from the mixed account, which was equivocal, so far as this issue is concerned. Unless we can presume that they meant not to withdraw the bequeathed money, they must fail; if we can, then the withdrawal may itself be taken as an expression of their intent. There cannot be the slightest doubt that if they had known the consequences—that is, if they had known the law—they would not have used bequeathed property. Yet, judged merely by the evidence, we should have no right to say that they did know the law or consider the consequences.

However, presumptions are the creatures of law, more than mere inferences from the evidence, else they would only be part of the process of ordinary reasoning. It is true that generally they are rationally appropriate to the situation, but they do not depend upon the cogency of the proof; they presuppose a bias. When a trustee withdraws money from a fund made up of his own and his beneficiary's property, we presume that he means to take out his own, so long as any could be left, Knatchbull v. Hallett, L. R. 13 Ch. Div. 696; In re Berry, 147 F. 208 (C. C. A. 2); Board of Commissioners of Crawford County, Ohio, v. Strawn, 157 F. 49, 51 (C. C. A. 6), 15 L. R. A. (N. S.) 1100; Empire State Surety Co. v. Carroll County, 194

F. 593, 605 (C. C. A. 8). This might, indeed, be no more than a way of saying that the probabilities in fact favor such a conclusion; but the presumption would probably extend to instances where the inference was too tenuous to have any rational support, and we think it rather a true presumption. The law insists upon so regarding the transaction until some positive evidence to the contrary is forthcoming; it loads the scales of reason for its own purposes.

We think that the situation at bar is such as to justify raising a similar presumption; that is, that the executors did act with a view to the estate's best interest, which, as we have said, is equivalent to assuming that they knew the law. Like any other presumption, it would cease, once proof were introduced on the other side. Here there was none. So, while as mere matter of reasoning we agree that we should have no right to conclude that they did so intend, we hold the transaction one where justice requires us to act as though they had. If we did not, we should have to presume that the earliest withdrawals were from the earliest deposits, an equally gratuitous assumption, and adopted only in default of any other. It is true that we might hold that, in the absence of all proof, the taxpayer should fail; but, in so doing, we should abandon doctrines generally applicable to such situations, which are dealt with by recourse of one sort or another to such devices.

Order reversed as to the "rights"; affirmed as to the mixed fund.