In re Frances G. BRIDGE, Debtor.

Fred J. DERY, Trustee, Plaintiff,

v.

UNITED STATES of America, et al., Defendant.

Bankruptcy Nos. 81–01913–R, 84–0875–R.

Adv. Proceeding.

United States Bankruptcy Court, E.D. Michigan.

Sept. 6, 1988.

Marta A. Manildi, Schlussel, Lifton, Simon, Rands, Galvin & Jackier, Southfield, Mich., for plaintiff.

Karl Overman, U.S. Atty's. Office, Detroit, Mich., for defendant.

## MEMORANDUM OPINION

STEVEN W. RHODES, Bankruptcy Judge.

On April 2, 1981, an involuntary bankruptcy petition was filed against Frances G. Bridge. On September 21, 1982, the United States Customs Service seized $670,000 in Canadian Treasury Bills from William Bridge, the debtor's husband. He had carried them into Detroit from Windsor, Ontario, and did not declare them, in violation of 31 U.S.C. § 5311, *et seq.* On January 30, 1985, the United States filed a

forfeiture action against the bills in the United States District Court, pursuant to 31 U.S.C. § 5317.

On September 23, 1987, the trustee, Fred J. Dery, filed a Motion for an Order Declaring Applicability of the Automatic Stay and for an Injunction. Specifically, Dery seeks an order declaring that the forfeiture action is stayed and is void and of no effect.

At an initial hearing, the Court ruled that 11 U.S.C. § 362(a) would preclude the United States from prosecuting a post-petition forfeiture action against estate property.[1] However, because the parties disputed whether the bills are estate property, the Court held an evidentiary hearing.

The Court now concludes that the $670,000 in Canadian Treasury Bills are the proceeds of a fraudulent conveyance, and therefore are property of the estate. Accordingly, the Court will grant the relief that Dery seeks.

## I. *Background*

By 1980, Frances and William Bridge[2] had incurred debts of several million dollars. (Exhibits 22, 29, 33, 42, 46 and 124.) They then undertook a series of complex transactions, which Dery contends were intended to hide their assets and defraud their creditors.

First, on January 2, 1980, the Bridges executed a Trust Agreement creating the "Bridge Trust," which named themselves and their children as beneficiaries, and their son, John Bridge, as trustee. (Exhibit 52) According to the Trust Agreement, the Bridges conveyed $100 to the trust at that time. The Trust Agreement contained spendthrift language and granted the trustee sole discretion over disbursements.

On March 20, 1980, Shillelagh Farms, Inc., was incorporated.[3] Its stock was owned by the Bridge Trust. (Exhibit 115) The corporation had no assets.

On March 24, 1980, two deeds were executed, transferring property worth five million dollars to Shillelagh Farms. The first deed, executed by Frances and William Bridge, concerned property at 3999 E. South Boulevard, Auburn Hills, Michigan. (Exhibit 112) That property consisted of forty-five acres of land, the Bridge family residence, a horse farm, and office buildings.[4] The deed was recorded with the Oakland County Register of Deeds on May 22, 1980.[5]

The Bridges received no valuable consideration for the deed. Shillelagh gave them only a promissory note in the amount of $500,000 (Exhibit 114), the terms of which render it worthless. Under the note, no down payment was made and installment payments are due quarterly until May 1, 2010, when the balance is due. The interest on the note was fixed at 9%, although the prime rate of interest on commercial loans was then 17%. (Exhibit 76) The note contained no provision to accelerate the unpaid balance in the event of a default; the only remedy was an increase in the interest rate from 9% to 9½% for the past due amounts. Moreover, the note was unsecured. Raymond Lombardi, an accountant retained by Dery, testified that

---

1. Specifically, the Court concluded that subsection (3) of 11 U.S.C. § 362(a) applied, because the forfeiture action was an act "to exercise control over property of the estate."

   The Court further concluded that the forfeiture action was *not* stayed by subsection (1) of 11 U.S.C. § 362(a), because it was not a proceeding "against the debtor that was or could have been commenced" pre-petition. As noted, the seizure occurred, and the forfeiture action was filed, post-petition. Accordingly, there was no need to consider the stay exception found in 11 U.S.C. § 362(b)(4), relating to actions to enforce the government's "police or regulatory power." *See NLRB v. Edward Cooper Painting, Inc.,* 804 F.2d 934 (6th Cir.1986); *In re Ryan,* 15 B.R. 514 (Bankr.D.Md.1981). By its terms, that exception only applies to the stay of Section 362(a)(1).

2. An involuntary petition was filed against William Bridge on April 3, 1984, Bankruptcy Case Number 84–01203–R. The two cases were subsequently consolidated for administration.

3. John Bridge was named President, Treasurer, Secretary and Registered Agent for Shillelagh. (Exhibit 53)

4. The Bridges also executed a Bill of Sale transferring all of the personal property at the South Boulevard property to Shillelagh Farms. (Exhibit 113)

5. For purposes of 11 U.S.C. § 548(a), the transfer is deemed to have been made on the date of recording. 11 U.S.C. § 548(d)(1).

because of its unusual terms, the promissory note was worthless. (Trial Transcript, p. 247; Exhibit 76) The United States did not introduce any contrary evidence.

The second deed, executed by Frances Bridge, concerned a 16,891 acre ranch in Nebraska called "Arabia Ranch." [6] (Exhibit 58) This deed was recorded on May 27, 1980. Again, Frances received no valuable consideration for this deed. Shillelagh gave her only a promissory note in the face amount of $3.6 million (Exhibit 59), and did not assume the existing mortgages on Arabia Ranch, which exceeded three million dollars. Because this note contains the same unusual provisions as the South Boulevard note, Lombardi concluded that it, too, was worthless. (Trial Transcript, p. 247 and Exhibit 76)

At the same time, William Bridge transferred his various corporations to Shillelagh Farms, including Bloomfield Corporation, Bloomfield Concepts, Inc., Baker Engineering Company, and National Equipment Corporation. He received no consideration for these assets. (Exhibit 115)

Thus, on March 24, 1980, the Bridges divested themselves of all their assets, although they were still liable on their very large debts. They were thus rendered insolvent.

On December 20, 1980, Shillelagh Farms sold Arabia Ranch to Michael Liddy for $4,476,115. (Exhibits 4, 15 and 61) The proceeds from the sale were disbursed to various banks and creditors, and Shillelagh Farms received $500,000.

Shillelagh Farms also sold 3000 tons of hay to Liddy for $165,000, of which $105,000 was paid to Shillelagh Farms and $60,000 was paid to Bloomfield Corporation. (Exhibits 134, 135 and 136)

Shillelagh Farms also received $249,358.80 from an auction of personal property held at Arabia Ranch on December 1, 1980. (Exhibits 65 and 69)

Dery argues that the proceeds of these three sales[7] in December of 1980 funded the $670,000 in Canadian Treasury Bills seized from William Bridge in September 1982. The government contends that the evidence fails to establish the necessary connection. The tracing of the proceeds of the Arabia Ranch sale in those twenty-two months is discussed in Part II.

## II. *The Tracing*

### A. Arabia Ranch Proceeds

On January 26, 1981, Shillelagh Farms received $500,000 from the sale of Arabia Ranch. (Request for Admissions No. 51, and Exhibit 64) On January 27, 1981, with this $500,000, William Bridge purchased five certificates of deposit in the name of Shillelagh Farms, each in the amount of $100,000, at the Bank of Nova Scotia of Windsor, Ontario.[8] (Exhibits 134 and 135, Request for Admissions Nos. 54 & 55, and Trial Transcript, Pickering, p. 303) These five CDs were in numerical sequence; the last three digits of the CDs were 195, 196, 197, 198 and 199. (These CDs are identified by these numbers for tracing purposes even though their identification numbers changed as they were rolled over.)

### I. CD 195

a. CD 195 (Exhibit 85) was redeemed on April 7, 1981. $100,000 was withdrawn and deposited into the Shillelagh Farms savings account at the Michigan National Bank. (Exhibits 129, 130 and Trial Transcript, Pickering, p. 304)

b. This resulted in an account balance of $125,000 in that savings account.

### 2. CD 196

a. On April 27, 1981, CD 196 (Exhibit 86) was redeemed and $50,000 was deposit-

---

**6.** Frances Bridge also executed a Bill of Sale reciting goods and chattel consisting of: "all fixtures, furniture, household goods and furnishings and equipment of all kind (including irrigation equipment) located at Arabia Ranch, Wood Lake, Nebraska." (Exhibit 62)

**7.** These three sales are referred to collectively as the "Arabia Ranch sale."

**8.** These findings regarding amounts in the various accounts do not always include interest earned on the deposits or currency exchange adjustments. As a result, the totals may not always agree.

ed into the Shillelagh Farms savings account at Michigan National Bank. (Trial Transcript, Pickering, p. 307 and Exhibits 129, 130) By April 30, 1981, the balance in the account was only $121.38. (Exhibit 130)

b. The balance of CD 196, $54,421.10, was transferred to CD 198. (Exhibit 88 and Trial Transcript, Pickering, p. 307)

### 3. CD 198 [9]

a. On May 4, 1981, $54,421.10 was deposited into CD 198 (Exhibit 88) from CD 196. (Trial Transcript, Pickering, p. 310)

b. On May 11, 1981, the CD was redeemed and the entire balance, $164,819.48, was deposited into CD 197. (*Id.*)

### 4. CD 199

a. CD 199 (Exhibit 89) was redeemed on February 26, 1981 (Exhibit 139, Deposition of Margaret McCormack, pp. 23–24), and $100,000 was deposited into the Shillelagh Farms checking account at Bank of Nova Scotia. (Exhibit 92 and Trial Transcript, Pickering, p. 312)

b. $99,900 was withdrawn from that account on March 6, 1981, leaving $100 in the account. The account was then inactive. (Exhibit 92)

c. On February 26, 1981, this $99,900 was deposited into the accounts of Shillelagh Farms at Michigan National Bank, as follows: (Trial Transcript, Pickering, p. 313)

i. $91,900 was deposited into the savings account. (Exhibits 129 and 130; Trial Transcript, Pickering, p. 316) By March 24, 1981, the account balance was $1,829.10. (Exhibit 130)

ii. $8000 was deposited into the checking account. On the next day, $8000 was withdrawn. (Exhibit I)

### 5. CD 197

a. On May 11, 1981, $164,819.48 was deposited into CD 197 (Exhibit 87) from CD 198.

b. Also on May 11, 1981, $50,000 was withdrawn and deposited into the Shillelagh Farms checking account at the Bank of Nova Scotia. (Exhibit 92 and Trial Transcript, Pickering, p. 318) On May 19, 1981, $50,000 was withdrawn from the Bank of Nova Scotia. (Exhibit 92)

c. On June 18, 1981, $60,000 was withdrawn from CD 197. (Trial Transcript, Pickering, p. 319 and Exhibit 139, Deposition of McCormack, pp. 55 and 58)

d. On October 20, 1981, $134,000 was withdrawn and deposited into the Shillelagh Farms checking account at the Bank of Nova Scotia. (Exhibit 92 and Trial Transcript, Pickering, p. 319) On October 22, 1981, the $134,000 was withdrawn from the Bank of Nova Scotia account, and deposited into the Shillelagh Farms account at the brokerage firm of Pitfield Mackay Ross in Windsor, Ontario. (Exhibit 101 and Trial Transcript, Pickering, p. 320)

e. On December 23, 1981, the balance of CD 197, $39,576.23, was withdrawn and deposited into the Shillelagh Farms checking account at Michigan National Bank. (Trial Transcript, Pickering, p. 322)

### B. Proceeds from the Arabia Auction

On December 1, 1980, Shillelagh Farms received $249,358.80 from the personal property auction. (Exhibits 65 and 69) This is traced as follows:

1. On December 19, 1980, $99,358.80 was deposited into the Shillelagh Farms checking account at Michigan National Bank. (Exhibits 129 and I) On December 30, 1980, $99,000 was withdrawn from that account.

2. On December 19, 1980, the balance of $150,000 was deposited into the Shillelagh Farms savings account at Michigan National Bank. (Exhibit 129) On January 15, 1981, this $150,000 was transferred to the Shillelagh Farms checking account at Michigan National Bank, from which it was then withdrawn and deposited into a savings account at Bank of Nova Scotia to cover a previous deposit that was uncollectable. As described below, this amount was then used to purchase CDs 398 and 352. (Exhibits 132 and 133; Exhibit 139, pp.

---

9. CD 197 is discussed below.

12–19; Trial Transcript, St. Louis–Nock, p. 273)

## C. The Proceeds from the Hay Sale

From the sale of hay, Shillelagh Farms received a check for $105,000 and the Bloomfield Corporation received a check for $60,000. The Bloomfield Corporation check was deposited into the Bank of Nova Scotia. On January 13, 1981, the Shillelagh Farms check was combined with $150,000 from the Shillelagh Farms savings account at the Bank of Nova Scotia to purchase two CDs at the Bank of Nova Scotia: CD 398 (Exhibit 84) in the amount of $155,000 and CD 352 (Exhibit 83) in the amount of $100,-000. These CDs are traced as follows:

### 1. CD 398

a. On June 15, 1981, an additional $40,-000 was added from CD 493.[10] (Exhibit 90 and Exhibit 139 at p. 72)

b. On July 15, 1981, $10,000 was withdrawn and deposited into the Shillelagh Farms checking account at Michigan National Bank. (Exhibit G; Trial Transcript, Pickering, pp. 327–328)

c. On October 15, 1981, the balance of $208,922.96 was withdrawn and combined with $157,545.25 from CD 352 (discussed below) for a $366,468.21 deposit into the "William O'Brien" account at Pitfield Mackay Ross. (Exhibits 105 and 139, pp. 64–65; Trial Transcript, p. 339)

### 2. CD 352

a. On May 15, 1981, $50,000 was deposited. (Exhibit 139, pp. 51–52)

b. On September 14, 1981, $10,000 was withdrawn and deposited into the Shillelagh Farms checking account at Michigan National Bank. (Exhibit H and Exhibit 139 at p. 52)

c. On October 14, 1981, the balance of $157,485.92 was combined with the funds in CD 398 for a total of $366,468.21, which was deposited into the William O'Brien account at Pitfield Mackay Ross, as described above.

10. CD 493 was purchased on May 22, 1981 in the name of "Fairmeadow Farms, Inc. affil-

## D. The Accounts at Pitfield Mackay Ross

During the period from June 12, 1981 through August 1982, William Bridge opened five accounts at Pitfield Mackay Ross, in the names of William O'Brien, Vince McIntyre, Castleton Ltd., Liffey Ltd., and Shillelagh Farms. (Trial Transcript, Alexander, pp. 150–160) As noted, Dery argues that the proceeds from the Arabia Ranch sale eventually ended up in these five accounts.

### 1. The William O'Brien Account

On October 15, 1981, Bridge opened this account with a deposit of $366,468.21, consisting of the proceeds from CDs 352 and 398. On October 20, 1981, the entire amount was withdrawn and deposited into the Shillelagh Farms account at Pitfield Mackay Ross. (Exhibits 101 and 105; Trial Transcript, Alexander, p. 155)

### 2. The Shillelagh Farms Account

On October 20, 1981, Bridge opened this account with the $366,468.21 transferred from the William O'Brien account. (Exhibits 101 and 105) Further activity consists of the following:

a. On October 20, 1981, an additional $134,000 was deposited into the Shillelagh account from the Bank of Nova Scotia savings account. (Exhibit 92; Trial Transcript, Pickering, pp. 337–338)

b. On January 6, 1982, a deposit of $34,-600 was made from an unknown source. (Exhibit 101)

c. On January 11, 1982, $75,000 was deposited from the Shillelagh Farms checking account at Michigan National Bank. (*Id.*)

d. On January 22, 1982, $70,000 was deposited from the Shillelagh Farms checking account at Michigan National Bank. (*Id.*)

e. On July 9, 1982, $150,000 was deposited from the Shillelagh Farms checking account at Michigan National Bank. (*Id.*)

iate—Shillelagh Farms," in the amount of $165,-000.

f.  On August 10, 1982, $16,666.67 was transferred to the Liffey account at Pitfield Mackay.  (Exhibit 103)

g.  On August 10, 1982, $25,000 was transferred to the Castleton account at Pitfield Mackay.  (Exhibit 102)

h.  After the transfers to the Liffey and Castleton accounts on August 10, 1982, a balance in excess of $300,000 remained. On September 22, 1982, the day after the Canadian Treasury Bills were seized, William Bridge demanded that Ted Alexander of Pitfield Mackay Ross withdraw the remaining funds in the account ($311,000) and bring the funds to him, which Alexander did.  (Exhibit A and Trial Transcript, Alexander, p. 210)

### 3.  The Vince McIntyre Account

On June 12, 1981, Bridge opened this account with a deposit of $50,000.  (Exhibit 104; Trial Transcript, Alexander, p. 151) Between June 15, 1981 and July 10, 1981, approximately $463,600 was deposited, all in cash or gold Kruggerands.  (Exhibit 104; Trial Transcript, Alexander, p. 168)  Although there was a series of withdrawals from the Vince McIntyre account, the balance in the account never fell below $463,-000.  (Trial Transcript, pp. 231–32)

### 4.  The Castleton Account

On August 20, 1982, $160,000 in Treasury Bills were transferred from the Vince McIntyre account to the Castleton account. (Exhibits 104 and 102)

### 5.  The Liffey Account

On the same day, $450,000 in Treasury Bills were transferred from the Vince McIntyre account to the Liffey account. (Exhibits 104 and 103)

On September 21, 1982, William Bridge took delivery of the $670,000 in Canadian Treasury Bills in dispute ($190,000 from Castleton and $480,000 from Liffey).

11.  The government asserts, although not vigorously, that the proceeds from the sale of hay are not property of the estate because the deed transferring Arabia Ranch to Shillelagh Farms did not particularly identify the hay.  Specifically, the government argues that the reference in the deed to "fixtures" is insufficient because hay is not a fixture under Nebraska law.

## III.  *Discussion*

### A.

Dery argues that the Bridges' transfers of all of their property to Shillelagh Farms were fraudulent and therefore void pursuant to 11 U.S.C. § 548(a).  He further argues that the Arabia Ranch sale proceeds are estate property pursuant to Section 541(a)(6).  Finally, Dery argues that the bills at issue are traceable to those proceeds and therefore are estate property.

The United States argues that the Treasury Bills are not property of the estate because the funds from the Arabia Ranch sale cannot be traced directly to the seized Treasury Bills.[11]  Specifically, relying on the testimony of IRS Agent Pickering, the United States argues that there are too many gaps in the tracing and that the commingled money lost its identity.  Agent Pickering testified that once money is deposited and commingled with other money, it cannot be traced if there are subsequent withdrawals of different amounts or other intervening activity.  (Trial Transcript, p. 347)

### B.

For the following reasons, the Court concludes: (1) that Frances Bridge's transfer of Arabia Ranch to Shillelagh Farms on March 24, 1980 was a fraudulent transfer; (2) that the proceeds of the sale of Arabia Ranch by Shillelagh Farms on December 20, 1980 are property of the estate; (3) that the Canadian Treasury Bills at issue are traceable to those proceeds; and (4) that therefore the bills are property of the estate.

### 1.

11 U.S.C. § 548(a) provides:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor,

The Court rejects this argument because the deed and the other instruments of conveyance amply demonstrate that the Bridges intended to transfer everything connected with Arabia Ranch to Shillelagh Farms.  See Note 6, above.

that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

"[T]he finding of the requisite intent may be predicated upon the concurrence of facts which, while not direct evidence of actual intent, lead to the irresistible conclusion that the transferor's conduct was motivated by such intent." 4 *Collier on Bankruptcy*, § 548.02[5] (15th ed. 1988).

The Court concludes that the Bridges intended to defraud their creditors when they created the Bridge Trust, incorporated Shillelagh Farms, and divested themselves of all of their assets.

■ The trust was a discretionary spendthrift trust created for the benefit of the settlors, and is therefore void as a fraud on the Bridges' creditors. *Gilky v. Gilky*, 162 Mich. 664, 666, 127 N.W. 715 (1910). Like-

wise, the Court cannot identify any legitimate purpose for Shillelagh Farms; plainly, the Bridges incorporated it in an attempt to hide their assets.

Finally, Frances Bridge's transfer of Arabia Ranch to Shillelagh Farms was also fraudulent. The evidence amply demonstrates that this transfer was undertaken for inadequate consideration and with the intent to deceive, and that it rendered Frances Bridge insolvent. Thus, the fraudulent nature of these conveyances is clear.[12]

2.

■ Property recovered by the trustee pursuant to 11 U.S.C. §§ 548 and 550 is property of the estate, pursuant to 11 U.S.C. § 541(a)(3).

The scope of § 541(a) is broad and is intended to include in the estate any property made available by other provisions of the code. As stated in *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204–205, 103 S.Ct. 2309, 2313–2314, 76 L.Ed.2d 515 (1983):

The House and Senate Reports on the Bankruptcy Code indicate that § 541(a)(1)'s scope is broad. Most important, in the context of this case, § 541(a)(1) is intended to include in the estate any property made available to the estate by other provisions of the Bankruptcy Code. See H.R.Rep. No. 95–595, p. 367 (1977). Several of these provisions bring into the estate property in which the debtor did not have a possessory interest at the time the bankruptcy proceedings commenced.[10]

Section 542 is such a provision.

10 See, *e.g.*, §§ 543, 547 and 548. These sections permit the trustee to demand the turnover of property that is in the possession of others if that possession is due to a custodial arrangement, § 543, to a preferential transfer, § 547, or to a fraudulent transfer, § 548.

Here, Dery does not seek to avoid those transfers as such; rather he seeks to recover for the estate the proceeds from the

---

12. The Michigan Uniform Fraudulent Conveyance Act, M.C.L. § 566.11 *et seq.*, identifies several types of fraudulent conveyances: (1) a conveyance by an insolvent (M.C.L. § 566.14); (2) a conveyance without fair consideration (M.C.L. § 566.15); (3) a conveyance by a person about

to incur debts (M.C.L. § 566.16); and (4) a conveyance made with the intent to defraud (M.C.L. § 566.17). All of the above except number three apply in this case. *In re Bidlofsky*, 57 B.R. 883 (Bankr.E.D.Mich.1985). *See* 11 U.S.C. § 544(b).

sales of the property fraudulently conveyed. Pursuant to 11 U.S.C. § 541(a)(6), proceeds of estate property are likewise estate property. Accordingly, the Court concludes that the proceeds of the Arabia Ranch sale are property of the estate.

### 3.

■ The Court further concludes that the Treasury Bills at issue are traceable to the proceeds of the Arabia Ranch sale. Although Agent Pickering's investigation was thorough and her testimony was credible, the Court must reject the government's legal position that estate funds,[13] once commingled, are "lost."

The Court of Appeals for the Sixth Circuit has held:

> The blending of the trust money with the money of the trustee was suffered at one time to defeat the owner's title and compel him to stand as a mere unsecured creditor. This was upon the idea that money was not earmarked, and, therefore, could not be recovered in specie. But the later cases have met this difficulty in the case of blended moneys in a bank account, from which there have been drawings from time to time, by the fiction that the sums thus drawn out were from the moneys which the tort-feasor had a right to expend in his own business, and that the balance which remained included the trust fund which he had no right to use.... But as this is a mere presumption it will not stand against evidence. It is, therefore, a part of the rule applicable to following misappropriated moneys into a bank account that, if at any time during currency of the mingled account the drawings out had left a balance less than the trust money, the trust money must be regarded as dissipated except as to this balance, the sums subsequently added to the account from other sources not being attributed to the trust fund.

*Board of Com'rs of Crawford County, Ohio v. Strawn,* 157 F. 49, 51 (6th Cir.1907) (citing *National Bank v. Insurance Co.,* 104 U.S. 54, 26 L.Ed. 693, (1881)). *See also, Brown & Williamson Tobacco Corp. v. First National Bank of Blue Island,* 504 F.2d 998 (7th Cir.1974) and 4 *Collier on Bankruptcy,* § 541.13 at 541.76–541.77 (15th ed. 1988).

The Court of Appeals has further held:

> It is true that in the case of blended moneys in a bank account, consisting in part of trust funds, from which there have been drawings from time to time, it has been held, in favor of the cestui que trust, as a presumption of law, that the sums first drawn out were from the moneys which the tort-feasor had a right to expend in his own business, and that the balance which remained included the trust fund, which he had no right to use. It is clear, however, in the first place, that this is a mere presumption which will not stand against evidence to the contrary.
>
> And it is furthermore clear that this rule of presumption has no application where the evidence shows that the first moneys drawn out of the mingled fund by the tort-feasor were not in fact dissipated by him at all, but were merely transferred, in a substituted form, to another fund retained in his own possession. In such case, it must be held that the trust attaches to the substituted form in which the property is retained by the tort-feasor, and that the right to follow the trust in such form is not lost by reason of the fact that the tort-feasor thereafter draws out and spends for his own purposes the balance of the fund in which the trust money was originally mingled. (Citations omitted.)

*Brennan v. Tillinghast,* 201 F. 609, 614 (6th Cir.1913) (citing, *Board of Comr's v. Stawn,* 157 F. 49, 51 (6th Cir.1907)). *See*

---

**13.** The Court recognizes that these tracing principles have been applied where the property of an express or implied trust is sought to be traced. Typically this occurs when the property of an express trust has been misappropriated, or when the Court imposes a constructive trust on property wrongfully obtained.

In this case, it is unnecessary to impose a constructive trust because the trustee is simply tracing property of the estate. Nevertheless, the Court concludes that the tracing principles applied in trust cases are readily applicable here; the United States does not contend otherwise.

| Date | Source | Amount |
|------|--------|--------|
| 6/5/81 | MNB–SF (Savings) | $ 7,000 |
| 6/18/81 | CD 197 | 60,000 |
| 6/23/81 | MNB–SF (Savings) | 5,000 |
| 6/25/81 | MNB–SF (Savings) | 15,000 |
| 6/25/81 | MNB–SF (Savings) | 5,000 |
| Total | | $642,625 |

*also, Republic Supply Co. of California v. Richfield Oil Co. of California,* 79 F.2d 375, 378 (9th Cir.1935); *In re Preston,* 76 B.R. 654 (Bankr.C.D.Ill.1987); *In re Seneca Oil Co.,* 76 B.R. 813 (W.D.Okla.1987).

In this case, it is not fatal to the trustee's position that, dollar for dollar, the exact funds cannot be traced. The evidence demonstrates that the Arabia Ranch sale was the sole source of the $670,000 in Canadian Treasury Bills and the $311,000 of cash remaining on account at Pitfield Mackay Ross on the day the Treasury Bills were seized.

Initially, there is no difficulty in tracing $642,625 of sale proceeds directly through the 5 CDs to the following substantial cash withdrawals:

| Date | Source | Amount |
|------|--------|--------|
| 12/30/80 | MNB–SF (Checking) | $ 99,000 |
| 2/27/81 | MNB–SF (Checking) | 8,000 |
| 3/4/81 | MNB–SF (Savings) | 20,000 |
| 3/6/81 | MNB–SF (Savings) | 5,000 |
| 3/10/81 | MNB–SF (Savings) | 5,000 |
| 3/12/81 | MNB–SF (Savings) | 5,000 |
| 3/13/81 | MNB–SF (Savings) | 5,000 |
| 3/16/81 | MNB–SF (Savings) | 26,750 |
| 3/17/81 | MNB–SF (Savings) | 15,000 |
| 3/20/81 | MNB–SF (Savings) | 5,000 |
| 3/24/81 | MNB–SF (Savings) | 8,000 |
| 3/30/81 | MNB–SF (Savings) | 5,000 |
| 4/2/81 | MNB–SF (Savings) | 5,000 |
| 4/3/81 | MNB–SF (Savings) | 3,000 |
| 4/10/81 | MNB–SF (Savings) | 21,840 |
| 4/14/81 | MNB–SF (Savings) | 3,000 |
| 4/15/81 | MNB–SF (Savings) | 50,000 |
| 4/16/81 | MNB–SF (Savings) | 10,000 |
| 4/17/81 | MNB–SF (Savings) | 5,000 |
| 4/24/81 | MNB–SF (Savings) | 2,000 |
| 4/24/81 | MNB–SF (Savings) | 7,035 |
| 4/27/81 | MNB–SF (Savings) | 28,000 |
| 4/29/81 | MNB–SF (Savings) | 5,000 |
| 4/29/81 | MNB–SF (Savings) | 50,000 |
| 4/30/81 | MNB–SF (Savings) | 3,000 |
| 4/30/81 | MNB–SF (Savings) | 3,000 |
| 5/15/81 | MNB–SF (Savings) | 66,000 |
| 5/19/81 | MNB–SF (Savings) | 5,000 |
| 5/19/81 | MNB–SF (Checking) | 50,000 |
| 5/20/81 | MNB–SF (Savings) | 5,000 |
| 5/22/81 | MNB–SF (Savings) | 5,000 |
| 5/27/81 | MNB–SF (Savings) | 5,000 |
| 5/29/81 | MNB–SF (Savings) | 5,000 |
| 6/2/81 | MNB–SF (Savings) | 7,000 |

From the other end, there is no difficulty in tracing the purchase of the Treasury Bills in the Castleton and Liffey accounts to the earlier cash and gold deposits of $421,000 into the Vince McIntyre account. The only issue is whether there is a connection between the $642,625 in cash withdrawals and the $421,000 in cash and gold deposits into the Vince McIntyre account.

The Court concludes that the evidence establishes such a connection. IRS Agent Pickering testified that the Bloomfield Corporation maintained a cash account journal at the South Boulevard offices, and that the ledger entries of withdrawals from that account match the dates and amounts for the cash and gold deposits into the Vince McIntyre account. (Trial Transcript, p. 329) Agent Pickering testified that she did not know where the cash found at the Bloomfield Corporation came from. However she stated:

> I was told that they had a lot of cash according to a bookkeeper and there were various safes at the premises. When I say premises, I'm referring to the South Boulevard location. (Trial Transcript, p. 344)

Thus, the question becomes where that cash maintained at the South Boulevard property came from. For two reasons, the Court concludes that the cash came from the cash withdrawals described above.

First, the credible evidence [14] demonstrates that the only possible source for that cash was those withdrawals; as noted earlier, after March of 1980, the Bridges had no assets whatsoever from which that cash could have been derived. In the final

---

**14.** William Bridge testified (Transcript 118–121) that the funds used to purchase the Treasury Bills at issue came from $500,000 in cash that Fairmeadow Farms (another Bridge entity) had before the Arabia Ranch sale. The Court concludes that this testimony is not worthy of belief for several reasons. First, the testimony was vague. Second, it was based upon hearsay from Bridge's accountant. Third, the testimony lacks any corroboration in the documentary evidence. Fourth, Bridge's demeanor as a witness was inappropriate and unimpressive; he was argumentative, rambling, angry, and on occasion insulting. In short, he was a difficult witness, and the Court had no sense that he knew what he was talking about.

analysis, the government's position that the bills at issue are not traceable to the Arabia Ranch sales logically requires that some other source must have existed. Because the evidence effectively rules out such a source, the government's position must be rejected.

Beyond that, the Court must recognize that the Bridges perpetrated a fraud that can only be described as massive. They moved very substantial amounts of money among numerous accounts in several names (both real and imaginary) in several financial institutions on a regular basis for almost two years, during which time their debts exceeded several million dollars, all in an effort to hide their assets from their creditors. Plainly, this massive scheme included using substantial sums of cash in the ways described above.

> It is undeniable that equity will follow a fund through any number of transmutations, and preserve it for the owner as long as it can be identified.

*Farmers & Mechanics National Bank v. King,* 57 Pa. 202 (1868), *quoted in National Bank v. Insurance Co.,* 104 U.S. 54, 69, 26 L.Ed. 693 (1881).

Because the bills are traceable as proceeds of property of the estate, they are likewise property of the estate, pursuant to 11 U.S.C. § 541(a)(6).

Accordingly; the Court concludes that the $670,000 in Canadian Treasury Bills are property of Frances Bridge's estate, and that the relief that Dery seeks should be granted.

An appropriate order may be submitted.